In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-01-00104-CV


______________________________




MOHAMMED KHAN AND JAMILA WILLIAMS, Appellants



V.



SHELL OIL COMPANY AND MOTIVA ENTERPRISES, L.L.C., Appellees




 


On Appeal from the 157th Judicial District Court


Harris County, Texas


Trial Court No. 99-42848A




 




Before Cornelius, C.J., Grant and Ross, JJ.


Opinion by Chief Justice Cornelius



O P I N I O N



 Mohammed Khan and Jamila Williams sued Shell Oil Company ("Shell") to recover damages
resulting from personal injuries suffered by Khan when he was shot during an armed robbery at the
Shell service station where he worked. The trial court granted summary judgment in favor of Shell,
from which Khan and Williams now appeal.

 The single issue presented for review is whether granting summary judgment was error. The
propriety of rendering summary judgment is a question of law. We review de novo the trial court's
decision to grant summary judgment. Natividad v. Alexsis, Inc., 875 S.W.2d 695, 699 (Tex. 1994);
Nixon v. Mr. Prop. Mgmt. Co., 690 S.W.2d 546, 548-49 (Tex. 1985). 

 With a traditional motion for summary judgment, the movant bears the burden of establishing
that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.
Tex. R. Civ. P. 166a(c); Randall's Food Mkts., Inc. v. Johnson, 891 S.W.2d 640, 644 (Tex. 1995). 
A defendant moving for summary judgment must negate at least one essential element of each of the
plaintiff's theories of recovery, Gibbs v. Gen. Motors Corp., 450 S.W.2d 827, 828 (Tex. 1970), or
plead and conclusively establish each element of an affirmative defense. City of Houston v. Clear
Creek Basin Auth., 589 S.W.2d 671, 678 (Tex. 1979). If the moving party does not meet its burden
of proof, the nonmovant has no burden and the summary judgment motion must fail. See id. If the
moving party produces summary judgment evidence entitling it to summary judgment, the burden
shifts to the nonmovant to present evidence that raises a material fact issue. Phan Son Van v. Pena,
990 S.W.2d 751, 752 (Tex. 1999); Walker v. Harris, 924 S.W.2d 375, 377 (Tex. 1996). In deciding
whether there is a disputed material fact issue precluding summary judgment, summary judgment
evidence favorable to the nonmovant will be taken as true, every reasonable inference must be
indulged in favor of the nonmovant, and any doubts resolved in the nonmovant's favor. Nixon, 690
S.W.2d at 548-49. 

 Khan sued Shell on theories of negligence and gross negligence. Common law negligence
consists of three elements: 1) a legal duty owed by one person to another; 2) a breach of that duty;
and 3) damages proximately resulting from the breach. Greater Houston Transp. Co. v. Phillips, 801
S.W.2d 523, 525 (Tex. 1990); Rosas v. Buddies Food Store, 518 S.W.2d 534, 536 (Tex. 1975). 
Shell moved for summary judgment on the ground that it owed no duty to Khan. Khan alleged that
Shell failed to provide him a safe place to work. The proper inquiry concerning duty in a case
alleging negligence in maintaining a safe workplace focuses on who had specific control over the
safety and security of the premises. See Exxon v. Tidwell, 867 S.W.2d 19, 23 (Tex. 1993). In
particular, the focus should be on who had the right to control the alleged security defects leading
to the plaintiff's injuries. See id. Thus, whether Shell had a duty to provide a safe workplace for
Khan turns on whether the company actually controlled or had a right to control those security-related matters that conceivably contributed to Khan's injuries. See id. (1) 

 Shell owns the service station at which Khan was employed and injured. Shell leases the
station to LA Sani, Inc., a company owned by Saleem R. Syed. Syed also acts as the manager of the
station. Khan suffered an injury during an armed robbery at the service station one morning at
approximately 4:00 a.m. According to Khan's affidavit, he was outside the station cleaning the
service bays and emptying a trash can when a man emerged from a dark side of the building wearing
a bandanna over his face and carrying a rifle. On seeing the man, Khan turned and ran toward the
station. He was shot while trying to lock the door behind him. 

 The business relationship between Shell and Syed (through his company) is governed
primarily by two documents, the lease and the dealer agreement. Shell argues that nothing in these
two documents gave it a right of control over the safety and security of the gas station, that all such
control was in the hands of Syed, and thus it owed no duty to Khan. Shell points out that the lease
agreement required Syed to personally and actively manage the business to assure compliance with
all provisions of the lease. The lease also required him to satisfy all regulatory requirements, and
he was prohibited from maintaining or permitting any condition at the station that might endanger
the health, safety, or well-being of anyone present at the station. In a paragraph entitled "Dealer's
Independence," the dealer agreement reads: 

 Dealer is an independent businessperson, and nothing in this Agreement shall
be construed as reserving to Shell any right to exercise any control over, or to direct
in any respect the conduct or management of, Dealer's business or operations
conducted pursuant to this Agreement; but the entire control and direction of such
business and operations shall be and remain in Dealer, subject only to Dealer's
performance of the obligations of this Agreement. 

Although Shell cites this paragraph as support for its position, Khan focuses on the words, "subject
only to Dealer's performance of the obligations of this Agreement," and argues that this is the
exception that "swallows the rule." According to Khan, Syed managed the service station in general,
but Shell reserved the right to control some security measures because Syed was obligated by the
lease and dealer agreements to obtain Shell's express permission before undertaking many actions
directly affecting the elements of security relevant here. Shell, in effect, had veto power over many
of Syed's security-related decisions. Khan further argues that although Syed had to obtain Shell's
prior permission before undertaking many security-related decisions, Shell had the right to enter the
premises and make such security-related changes on its own initiative.

 We agree with Shell that the contracts establish, in general, that the day-to-day operations
are the responsibility of Syed. Nevertheless, who controls general operating procedures is not the
relevant inquiry. See Exxon v. Tidwell, 567 S.W.2d at 19. We must determine who had a right to
control those security-related matters that conceivably contributed to Khan's injuries. The terms of
the contracts, even as understood by Shell as reflected in the testimony of its representative, support
Khan's position. 

 Shell's representative, Brooks Herring, testified that if Syed wanted to put up new lights for
greater illumination, install bullet-proof glass, or even put up a sign announcing minimal cash on
hand, he would be required by the contracts to obtain Shell's permission. Similarly, if Syed wanted
to install a security camera, he would need Shell's permission. Although Syed had to request
permission of Shell to make certain changes related to security, Shell had the power and the right to
step in at any time and make security-related changes itself, such as adding bullet-proof glass, extra
lighting fixtures, or outside fencing. Herring testified that safety and the prevention of crime were
relevant considerations when designing new service stations. Yet, as stated in the contracts and
understood by Herring, Syed could not remodel or alter the premises, even if directly related to
security, without Shell's permission. Syed, in fact, did submit a preliminary remodeling proposal to
Shell suggesting, among other things, the addition of proper exterior lighting for the express purpose
of making customers feel safer. The remodeling was not authorized, even though Syed did not
request that Shell finance it. 

 The strongest case on which Shell relies for support, Smith v. Foodmaker, Inc., 928 S.W.2d
683 (Tex. App.-Fort Worth 1996, no writ), is distinguishable. In that case, the appeals court
concluded that the franchisor did not retain any control over the safety and security of the premises
because it was not aware of any crime, violence, or security problems at the site; it did not require
the franchisee to report security problems; it did not direct, control, or advise the franchisee in terms
of security; it did not make any decisions regarding the hiring of guards or installation of security
cameras; and it did not require the franchisee to seek its prior approval to maintain or repair lighting,
doors, or locks. Id. at 686-87. 

 We note that knowledge of past criminal activity at the site is not relevant to the issue of who
had control over security matters at the time of the crime giving rise to the cause of action. The
second factor noted by the court in the Smith case, the duty to report security problems, existed in
our case by the express terms of the contracts. As to directing, controlling, or advising a franchisee
on security, Shell undertook to train its dealers on topics including security and required such
training of them. Shell could even require a franchisee to provide additional staff at a service station,
possibly even a security guard. And, although the contracts imposed on Syed the duty to keep the
premises illuminated, Shell had the right to install exterior lighting or security cameras, which Syed
could not do without Shell's prior permission.

 Shell clearly had the right to exercise control over some security-related matters. It is 
reasonable to infer from this fact that these matters may have been causally related to the robbery
in which Khan was shot. Therefore, there is some evidence of facts that may have imposed a duty
on Shell. Thus the summary judgment was improper. 

 We reverse the summary judgment and remand the cause to the trial court for further
proceedings.

 

 William J. Cornelius

 Chief Justice


Date Submitted: February 28, 2002

Date Decided: March 19, 2002


Publish
1. We distinguish here between a right of control and the exercise of control. A showing of
actual control is not necessary except where the right of control is not otherwise manifested. Exxon
v. Tidwell, 867 S.W.2d 19, 21-22 n.3 (Tex. 1993).



ll v. State, 194 S.W.3d 503, 506 (Tex. Crim. App. 2006). The reviewing court
must give deference to "the responsibility of the trier of fact to fairly resolve conflicts in testimony,
to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." 
Jackson, 443 U.S. at 318-19. In reviewing the sufficiency of the evidence, each fact need not point
directly and independently to the guilt of the appellant, so long as the cumulative force of all the
incriminating circumstances is sufficient to support the conviction. See Barnes v. State, 876 S.W.2d
316, 321 (Tex. Crim. App. 1994); Johnson v. State, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993). 
Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and
circumstantial evidence alone can be sufficient to establish guilt. Guevara v. State, 152 S.W.3d 45,
49 (Tex. Crim. App. 2004). On appeal, the same standard of review is used for both circumstantial
and direct evidence cases. Id.; see Hooper v. State, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

 Henderson was charged by indictment with delivery of cocaine. More specifically, the
indictment required the State to prove to the jury that Henderson actually or constructively
transferred cocaine weighing more than one gram but less than four grams to Cawthon on or about
April 15, 2003. See Tex. Health & Safety Code Ann. § 481.102(2)(D) (Vernon Supp. 2007)
(defining cocaine as penalty group 1 narcotic), § 481.112 (Vernon 2003) (criminalizing delivery of
penalty group 1 drug).

 The evidence, viewed in the light most favorable to the jury's verdict, showed that Cawthon
testified he purchased crack cocaine from Henderson in an Irving motel room on April 15, 2003. 
During this transaction, Cawthon offered to buy $100.00 of crack from Henderson. Henderson later
laid the cocaine on a table next to Cawthon's buy money, after which Henderson took the $100.00. 
This amounts to a constructive transfer of drugs for money. See Tex. Health & Safety Code Ann.
§ 481.002(8) (Vernon Supp. 2007) ("delivery" includes constructive transfers). The drugs sold to
Cawthon were later submitted to SWIFS for chemical analysis, this analysis revealing that the drugs
purchased by Cawthon from Henderson contained 1.48 grams of cocaine, including adulterants or
dilutants. The State's evidence satisfied the evidentiary requirements of the indictment, which was
authorized by and consistent with our criminal law; the evidence is, therefore, legally sufficient.

IV. Chain of Custody

 Henderson next contends there was a break in the chain of custody for the alleged drugs and
that, due to this break in the evidentiary chain of custody, the drugs should have been excluded. 
Henderson's brief does not attempt to demonstrate that error on this issue was preserved in the court
below. See Tex. R. App. P. 33.1(a), 38.1(h). For the most part, an error not properly preserved is
waived. Additionally, "problems in the chain of custody do not affect the admissibility of the [drug]
evidence. Instead, such problems affect the weight that the fact-finder should give the evidence,
which may be brought out and argued by the parties." Druery v. State, 225 S.W.3d 491, 503-04
(Tex. Crim. App. 2007) (footnote omitted). We overrule this issue.

V. Permitting Officer Gipson To Testify About the Drug Trade

 Henderson next contends the trial court erred by permitting Officer Tony Gipson of the
Dallas Police Department to testify in general terms about the practices employed in cocaine
trafficking. Henderson contends the trial court failed to conduct a Daubert (3) hearing regarding the
admissibility of Gipson's testimony as expert testimony. We review a trial court's ruling regarding
the admission of evidence under an abuse of discretion standard. Rankin v. State, 974 S.W.2d 707,
718 (Tex. Crim. App. 1996) (op. on reh'g); Montgomery v. State, 810 S.W.2d 372, 391 (Tex. Crim.
App. 1991) (op. on reh'g). Only if a trial court's decision falls outside the zone of reasonable
disagreement will that decision be reversed on appeal. Rankin, 974 S.W.2d at 718; Montgomery,
810 S.W.2d at 391.

 Henderson's complaint on this issue fails for three reasons. First, Henderson objected at trial
only to the relevance of Gipson's testimony and not to his qualifications to testify concerning the
evidence he presented. Therefore, the objection now raised on appeal--a challenge to Gipson's
qualifications to testify as an expert witness--was not first raised in the lower court and, therefore,
was not preserved for our review. Cf. Paschal v. State, 35 S.W.3d 80, 82 (Tex. App.--Texarkana
2000, no pet.) (general relevance objection insufficient to preserve appellate complaint about Rule
403). Second, the trial court sustained Henderson's general relevancy objection but Henderson
neither made the additional request that the trial court instruct the jury to disregard Gipson's
testimony nor did he otherwise pursue his relevancy objection to an adverse ruling. Therefore,
assuming (without deciding) that a general relevancy objection could ever be sufficient to preserve
Henderson's Daubert-esque complaint, Henderson failed to preserve the issue for appellate review
by not pursuing such an objection to an adverse ruling. Third, Gipson, as a veteran narcotics
detective with the Dallas Police Department, could have been properly admitted as an expert to
provide testimony regarding the manufacture and sale of crack cocaine in the area; the trial court
could have reasonably determined that such expert testimony would have assisted the jury by
providing it with information regarding the nuances of the illegal narcotics trade. See Tex. R. Evid.
702; Taylor v. State, 106 S.W.3d 827, 832-33 (Tex. App.--Dallas 2003, no pet.) (trial court would
not abuse discretion by permitting Detective Tony Gipson, veteran Dallas narcotics officer, to testify
as expert based on training and experience with manufacture, packaging, possession, and sale of
crack cocaine).

VI. Tulia Comparison

 Henderson also makes several attempts to compare his conviction in this case to the
erroneous convictions of several defendants, collectively called the "Tulia defendants," for narcotics
possession and trafficking. See, e.g., Editorial, Legislators Must Act To Free Tulia 13 on Bail if
Court Doesn't Move, Austin Am. Statesman, May 9, 2003, http://www.statesman.com/editorial/
content/editorial/tulia/0509tulia_edit.html. Henderson asks us to hold that the State's evidence was
manufactured by the Irving Police Department in much the same way as the evidence against the
Tulia defendants was manufactured. Henderson has attached several newspaper and internet articles
to his appellate brief in support of his point of error, including an article from the Winter 2006 issue
of "Justice Denied: The Magazine for the Wrongly Convicted." 

 In briefing this issue, Henderson has not cited to any location in the official appellate record
wherein there is evidence to support his claim that Irving police officers used manufactured evidence
or simulated narcotics to fraudulently obtain Henderson's conviction. Therefore, this issue has been
inadequately briefed, and we overrule it as such. See Tex. R. App. P. 38.1(h). Additionally, after
reviewing the record in this case, we are convinced that the existing record will not support such a
claim by Henderson. Therefore, Henderson's claim that he was framed can be more appropriately
pursued by filing a post-conviction application for writ of habeas corpus. See Tex. Code Crim.
Proc. Ann. art. 11.07 (Vernon Supp. 2007).

VII. Ineffective Assistance of Counsel

 In his next point of error, Henderson claims that his trial counsel performed deficiently in five
respects: his trial counsel (A) did not challenge the lack of affirmative links between the narcotics
and Henderson, (B) did not object to certain aspects of a police officer's testimony, (C) did not object
to the trial court's denial of requests for Brady (4) material, (D) failed to object to testimony from the
State's "surprise" witness, and (E) failed to object to veniremember 17 during voir dire. The standard
for reviewing claims of ineffective assistance on direct appeal is well settled. See Strickland v.
Washington, 466 U.S. 668 (1984); Hernandez v. State, 988 S.W.2d 770 (Tex. Crim. App. 1999). 
Texas appellate courts begin any such analysis by presuming that the appellant's trial counsel
performed competently. Thompson v. State, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). We also
presume that counsel's decisions were reasonably professional and were motivated by sound trial
strategy. Jackson v. State, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994). In the absence of direct
evidence of counsel's reasons for the challenged conduct, an appellate court will assume a strategic
motivation for the conduct if any can be imagined. Garcia v. State, 57 S.W.3d 436, 440 (Tex. Crim.
App. 2001). We will not conclude that the challenged conduct constitutes deficient performance
unless the conduct was so outrageous that no competent attorney would have engaged in it. Id.

 A. Lack of Affirmative Links

 Henderson claims that his trial counsel's failure to file a motion to suppress the admission
of the narcotics into evidence (due to the alleged lack of any affirmative links between Henderson
and the narcotics) amounted to ineffective assistance. As explained above, Cawthon's testimony
served to affirmatively link Henderson to the State's narcotics evidence. It is possible that, through
his pretrial investigation of the case, Henderson's trial counsel had already learned there was
sufficient evidence to link Henderson to the narcotics. Such an investigation would reasonably
support a strategic decision not to file a motion to suppress evidence.

 B. No Objection to Cawthon's Testimony

 Henderson next claims his trial counsel provided ineffective assistance by failing to object
to certain portions of Cawthon's testimony. This alleged failure concerned allowing Cawthon to
testify about how he (Cawthon) first came to know about Henderson as a suspected drug dealer
without there already being any previous testimony that Cawthon's informant had a previous
narcotics transaction relationship with Henderson. 

 We can imagine a strategic reason to explain counsel's alleged failure to object. The record
indicates that the now-complained-of testimony was being offered as background information so that
the jury could understand why the undercover officer was not surprised to see Henderson appear at
the motel room where the officer was working, even though the officer had initially been scheduled
to meet a different suspected drug dealer. Such evidence could be considered relevant by a trial
court, who could then choose to admit such evidence over any evidentiary objection under Rule 402
of the Texas Rules of Evidence. See Tex. R. Evid. 402. Henderson's trial counsel may have made
the strategic decision to not object because he reasonably believed such an objection (whether on
relevancy, confrontation, or other grounds) would likely be overruled by the trial court because such
testimony was arguably admissible.

 C. Failure To Object To Being Denied Brady Material

 According to Henderson's appellate brief, he personally made a pretrial request to the Irving
Police Department for a copy of Cawthon's personnel files, internal affairs files, departmental
folders, division folders, supervisor's folders, and other things. This open records request was
apparently denied. Subsequently, the record before us shows that Henderson's trial attorney
subpoenaed those same personnel records, which were provided to the trial court under seal. The
trial court thereafter conducted an in camera review of those personnel records and concluded that
the records contained no Brady material. (5) Henderson now contends that his trial counsel's failure
to further object to being denied access to those records amounts to ineffective assistance. 

 Once the lower court overruled trial counsel's request to review those subpoenaed personnel
records, Henderson's attorney was not required to further object in order to preserve the issue for
appellate review; Henderson's attorney had already obtained an adverse ruling on the issue, which
would have been sufficient to preserve any claim of error on this issue. See Tex. R. App. P. 33.1. 
Counsel was not ineffective in this regard.

 D. Allowing the State To Call a "Surprise" Expert Witness

 Henderson next contends that his trial counsel provided ineffective assistance by failing to
ask for a hearing outside the jury's presence to test the qualifications of Officer Gipson as an expert
witness. He also contends that Gipson's name was not disclosed to the defense before trial as a
potential witness.

 As discussed above, the record before us supports a decision to permit Gipson to testify as
an expert about the practices commonly employed in the sale and distribution of crack cocaine in the
Dallas area. It is possible that Henderson's trial counsel expected the State would be able to meet
the threshold for establishing Gipson's expert qualifications and, therefore, made the strategic
decision not to lengthen the trial process by requesting a hearing on Gipson's qualifications outside
the jury's presence. In fact, our sister court has written a published opinion about this same officer's
competency as an expert witness. See Taylor, 106 S.W.3d at 832-33.

 Additionally, the record before us does not contain the copy of the State's witness list that
was provided to Henderson before trial, nor did Henderson otherwise express surprise at trial to
Gipson having been called as a witness. Therefore, the record is inadequate to support his claim that
the State failed to provide Henderson with advance notice of any intent to call Gipson as an expert. 

 E. Failure To Object to the State's Challenge to Veniremember 17

 Finally, Henderson contends his trial counsel failed to object to the State's challenging a
member of the venire for cause during voir dire. The record before us shows that Henderson's trial
counsel did object to allowing the State to strike prospective juror number seventeen for cause. The
record also shows that the prospective juror testified that she would not vote to convict someone
based on the testimony of a single witness, even if she found that witness to be absolutely credible
and even if that witness's testimony otherwise proved all the essential elements of the alleged crime. 
Stated differently, the record shows that the prospective juror would have held the State to a higher
burden of proof than is otherwise required by law because she would have required more evidence
than merely the testimony of a single witness. Cf. Blackwell v. State, 193 S.W.3d 1, 19 (Tex.
App.--Houston [1st Dist.] 2006, no pet.) (proper for State to ask during voir dire if jurors can
convict on testimony of single witness if jurors believe witness beyond reasonable doubt on all
necessary elements to establish offense). 

 The record does not support Henderson's claim that his trial counsel failed to object. Nor
does the record support this conclusion that the trial court erred by denying the State's challenge to
prospective juror 17 because she clearly testified she would not convict an accused based on the
testimony of a single witness. 

 We overrule Henderson's claims of ineffective assistance of counsel.

VIII. Henderson Did Not Preserve His Article 38.141 Claim

 Henderson next claims that Article 38.141 of the Texas Code of Criminal Procedure violates
his rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States
Constitution. Henderson's brief fails to direct our attention to any location in the appellate record
wherein he preserved this issue for appellate review by first raising it in the trial court. See Tex. R.
App. P. 38.1(h) (appellate brief shall cite to official record from trial below in support of point of
error raised), 33.1 (preservation of error, how shown). As such, this issue has been inadequately
briefed and we overrule it as such. (6)

IX. Conclusion

 For the reasons stated, we overrule each of Henderson's points of error and affirm the trial
court's judgment.



 Bailey C. Moseley

 Justice


Date Submitted: November 28, 2007

Date Decided: December 20, 2007


Do Not Publish
1. Cawthon did not arrest Henderson at this time; Henderson was taken into custody two days
later after police obtained a warrant for Henderson's arrest. Shortly after purchasing the cocaine from
Henderson, Cawthon sealed the narcotics in a bag; this bag was then later sent to the Southwestern
Institute of Forensic Sciences (SWIFS). 
2. See Ex parte Brown, 205 S.W.3d 538, 544-45 (Tex. Crim. App. 2006) (in habeas
proceedings, establishing claim of actual innocence requires showing by clear and convincing
evidence that no reasonable juror could have found the accused guilty; claim of actual innocence on
direct appeal appropriate when record is adequate to evaluate claim).
3. Henderson makes reference to Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579
(1993). The correct rule in Texas criminal cases which employs a test for experts somewhat similar
to that in Daubert is set out in Kelly v. State, 824 S.W.2d 568 (Tex. Crim. App. 1992).
4. Brady v. Maryland, 373 U.S. 83 (1963).
5. See Brady, 373 U.S. 83. 
6. Henderson has also attached to his appellate brief an "exhibit 5," which he admits is not a
part of the record from the proceedings below. With limited exceptions inapplicable here, our
appellate review must be confined to the official record from the trial court's proceedings. See
Whitehead v. State, 130 S.W.3d 866, 872 (Tex. Crim. App. 2004) (citing Solomon v. State, 49
S.W.3d 356, 365 (Tex. Crim. App. 2001); Williams v. State, 937 S.W.2d 479, 487 (Tex. Crim. App.
1996)). We will not reward Henderson's attempt to circumvent our appellate rules by impermissibly
considering exhibits that have been improperly attached to his brief.