Juan Martin GARCIA, Appellant,

v.

The STATE of Texas.

No. 73,804.

Court of Criminal Appeals of Texas.

Oct. 3, 2001.

Floyd W. Freed, III, Spring, for Appellant.

Julie Klibert, Asst. DA, Houston, for State.

## OPINION

HOLCOMB, J., delivered the opinion of the Court, in which KELLER, P.J., and MEYERS, WOMACK, JOHNSON, KEASLER, HERVEY, and COCHRAN, JJ., joined.

A Harris County jury found appellant, Juan Martin Garcia, guilty of capital murder. See Tex. Pen.Code § 19.03(a)(2) (murder in the course of robbery). The trial court, acting in accordance with the jury's answers to the punishment stage special issues, sentenced appellant to death. Appellant now brings three points of error to this Court. We will affirm.

· The evidence presented at appellant's trial showed that during August and September of 1998, he and three accomplices went on a crime spree in Harris County.

As part of that crime spree, appellant attempted to rob 32 year old Hugo Solano. When Solano refused to hand over any money, appellant shot him four times in the head and neck, killing him. It was for that murder that appellant was tried, convicted, and sentenced to death.

In his first point of error, appellant argues that his trial counsel rendered ineffective assistance, in violation of the Sixth Amendment to the United States Constitution,[1] when, during the punishment stage of trial, counsel elicited certain damaging testimony from defense witness Dr. Walter Quijano, a clinical psychologist. Appellant, an Hispanic, argues that the testimony in question "tacitly asked [the jury] to consider race and ethnic stereotypes" in its determination of the first punishment issue, which concerned his future dangerousness to society.[2]

■ The record reflects that defense counsel's examination of Quijano covered his educational and professional background first and then turned generally to the subjects of predicting and, within a prison setting, controlling an individual's proclivity for criminal violence, i.e., his dangerousness. Defense counsel's examination also touched briefly on the subject of race vis-a-vis an individual's dangerousness:

Q [by Defense Counsel]: Dr. Quijano, are there certain factors that contribute to someone's dangerousness in society?

A: Yes.

Q: And can you tell us what those are?

A: Although dangerousness is difficult to predict, we know that there are certain factors that are associated with increased dangerousness or the absence of the factors with decreased dangerousness....

\* \* \*

Q: Can you tell us what those factors are?

A: There are three groups of factors. The first group is called statistical. The second group, called environmental. And the third group, I call clinical.

Q: And can you tell us what is in the first group or cluster of factors, if you will?

A: The first group, called statistical factors, include the age of the person, which is the best predictor of dangerousness. The younger the person, the more dangerous. The older the person, the less dangerous.

Prior assaultive crimes or prior assaults is also a strong predictor. The more prior assaults, the more violence in the past, the more dangerous in the future.

The use of drugs and alcohol during the commission of these assaultive events increases the probability of violence, and then, finally, the use of a weapon, the presence of which increases dangerousness. The absence of which decreases dangerousness.

Q: Does sex play a role?

---

1. The Sixth Amendment provides in relevant part that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the assistance of counsel for his defence." This right to counsel was made applicable to state felony prosecutions by the Due Process Clause of the Fourteenth Amendment. *Gideon v. Wainwright,* 372 U.S. 335, 345, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963).

2. The first punishment issue asked the jury to determine "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." See Tex.Code Crim. Proc. art. 37.071, § 2(b)(1).

A: Sex in the sense of gender plays a role in that males are statistically more violent than females.

Q: *What about whether or not someone is black, white, Hispanic? Does that play a role?*

A: *The race plays a role in that the— among dangerous people, minority people are overrepresented in this population. And, so, blacks and Hispanics are overrepresented in the—in the dangerous-so-called dangerous population.*

Q: What about economics?

A: Economics and stability of work record are also important in that the more unstable the work history or the more unstable the socioeconomic standing, the poorer the people, the more likely they are to be dangerous than those with steady employment and a reasonable socioeconomic status.

Q: What about whether or not there's any substance abuse?

A: Substance abuse, again, is a high risk factor in the future of violence.

Q: Now, are these—are some of these factors eliminated in a prison environment?

A: Most of these factors are either eliminated or kept to a minimum, reduced to a minimum within the prison setting. *Those factors that are biographical [biological?] are, of course, not eliminated, your gender and your race.*

Q: How are these certain factors eliminated in a prison setting?

A: Many of these factors are controlled, eliminated, kept to a minimum in the prison setting because of the controls that the prison system inflicts on the inmates. For example, weapons: although there are weapons in the prison, there is intense supervision so that they're kept to a small minimum. The presence of alcohol and drugs: there is alcohol and drugs in the prison, but, again, it's difficult to get them. So, those are two examples where the factors that contribute to dangerousness are kept to a minimum in the prison system.

\* \* \*

Q: Can dangerousness be situational?

A: Dangerousness is an interaction between what the person is and where he is or under what environmental controls the person is under. So that dangerousness would increase if the person is under a loose supervision setting, such as in the free community, and it would decrease dramatically in the prison where there is much controls imposed on him.

\* \* \*

Q: Are there certain safeguards at TDC [Texas Department of Corrections] that decrease one's dangerousness?

A: The—

Q: Such—I apologize, Doctor. Go ahead.

A: The answer is "yes." The whole stance of the prison system is to house these inmates, many of whom are violent and dangerous in the free community, to house them in a safe manner. So, there are many procedures and techniques that are intended to suppress whatever dangerousness that inmates bring with them.

\* \* \*

Q: Is the amount of dangerousness in someone, is it activated by certain environmental factors?

A: Yes.

Q: How does that fit in with being in a prison setting?

A: A person who has many characteristics or factors associated with dangerousness can go to the prison and much of those factors are either no longer relevant, such as employment, financial stability, and the prison system takes over those factors and subdues whatever dangerousness a person comes in. And, so, a person's dangerousness—the same person, the same person's dangerousness may be higher in the free world and lower in the prison, higher in some sections of the prison and lower in some sections of the prison.

\* \* \*

Q: Can someone in prison continue with threatening or assaultive behavior?

A: Threatening may continue. Assaultive, there is a point at which that is subdued.

Q: And why is that?

A: Because the prison system will do what it can to subdue assaultive, violent behavior in the prison. Now, threats, verbal threats, they may not be able to do much about that because they cannot shut the mouth, but actual overt assaults can be controlled physically, and TDC will apply whatever measures are necessary to control that.

The record does not reflect defense counsel's reasons for examining Quijano on the subject of race vis-a-vis an individual's dangerousness.

■ The Sixth Amendment guarantees the right to the reasonably effective assistance of counsel in state criminal prosecutions. *McMann v. Richardson,* 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970). In general, to obtain a reversal of a conviction on the ground of ineffective assistance, an appellant must demonstrate that (1) defense counsel's performance fell below an objective standard of reasonableness and (2) there is a reasonable probability that, but for counsel's unprofessional error(s), the result of the proceeding would have been different.[3] *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In assessing a claim of ineffective assistance, an appellate court "must indulge a strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance; that is, the [appellant] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689, 104 S.Ct. 2052 (some punctuation omitted). Also, in the absence of evidence of counsel's reasons for the challenged conduct, an appellate court "commonly will assume a strategic motivation if any can possibly be imagined," 3 W. LaFave, et al., *Criminal Procedure* § 11.10(c) (2d. ed 1999), and will not conclude the challenged conduct constituted deficient performance unless the conduct was so outrageous that no competent attorney would have engaged in it. See *Thompson v. State,* 9 S.W.3d 808, 814 (Tex.Crim.App.1999). Finally, an appellant's failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other prong. *Strickland v. Washington,* 466 U.S. at 697, 104 S.Ct. 2052.

Appellant has failed to demonstrate that his trial counsel's performance fell below an objective standard of reasonableness. Counsel might have been attempting, with Quijano's testimony, to do two things: (1) place before the jury all the factors it might use against appellant, either proper-

---

3. In some circumstances, none of which are applicable here, a showing that the result would have been different is not sufficient to show prejudice. See *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 1512, 146 L.Ed.2d 389 (2000).

ly or improperly, in its assessment of his future dangerousness and (2) persuade the jury that, despite all those negative factors, appellant would not be a future danger if imprisoned for life because the prison system's procedures and techniques would control or eliminate his tendency toward violence. Under the circumstances—the State had already presented evidence before the jury that appellant had a long and violent criminal record—we cannot say that counsel's conduct could not be considered sound trial strategy. We overrule appellant's first point of error.

 In his second point of error, appellant argues that the evidence adduced at trial was legally insufficient to support the jury's affirmative answer to the first punishment issue. As we noted in footnote three, *supra*, the first punishment issue asked the jury to determine "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." See Tex.Code Crim. Proc. art. 37.071, § 2(b)(1). The State had the burden of proving the first punishment issue beyond a reasonable doubt. *Id.* at § 2(c). Thus, the State had the burden of proving beyond a reasonable doubt that there is a probability that appellant, if allowed to live, would commit criminal acts of violence in the future, so as to constitute a continuing threat to people and property, whether in or out of prison. *Ladd v. State*, 3 S.W.3d 547, 557 (Tex.Crim.App.1999), *cert. denied*, 529 U.S. 1070, 120 S.Ct. 1680, 146 L.Ed.2d 487 (2000). In its determination of the issue, the jury was entitled to consider all of the evidence presented at trial. See Tex.Code Crim. Proc. art. 37.071, § 2(d)(1). As an appellate court reviewing the legal sufficiency of the evidence to support the jury's affirmative finding, we consider all of the record evidence in the light most favorable to the prosecution and

determine whether, based on that evidence and reasonable inferences therefrom, a rational jury could have found beyond a reasonable doubt that the correct answer to the first punishment issue was "yes." *Ladd v. State*, 3 S.W.3d at 558. This standard of review gives full play to the jury's responsibility fairly to resolve conflicts in the evidence, to weigh the evidence, and to draw reasonable inferences from the evidence. See *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). If, given all of the evidence, a rational jury would have necessarily entertained a reasonable doubt as to the probability of appellant's future dangerousness, we must reform the trial court's judgment to reflect a sentence of imprisonment for life. Tex.Code Crim. Proc. art. 44.251(a).

 Viewed in the necessary light, the evidence at trial established that (1) on June 24, 1992, when appellant was twelve years old, he committed the offense of terroristic threat; (2) on May 6, 1993, when appellant was thirteen years old, he committed misdemeanor theft; (3) on August 31, 1998, when appellant was eighteen years old, he committed three separate aggravated robberies; (4) on September 15, 1998, appellant again committed aggravated robbery; (5) on September 17, 1998, appellant shot and killed Hugo Solano, the victim in this case; (6) on that same date appellant also committed two aggravated robberies; (7) on September 20, 1998, appellant committed aggravated robbery and attempted capital murder; (8) on September 21, 1998, appellant committed aggravated robbery and attempted capital murder; and, finally, (9) on one day in November 1999, while appellant was incarcerated in the Harris County Jail awaiting trial in this case, he committed misdemeanor assault.

We conclude that the evidence adduced at appellant's trial was legally sufficient to support the jury's affirmative answer to the first punishment issue. Given the evidence of appellant's extensive criminal history, a rational jury could have concluded beyond a reasonable doubt that he exhibited a dangerous aberration of character, that he was essentially incorrigible, and that the correct answer to the first punishment issue was "yes." We overrule appellant's second point of error.

Finally, in his third point of error, appellant argues that "[t]he trial court reversibly erred in not charging the jury [at the punishment stage] that extraneous offenses [must] be proved by the [prosecution] beyond a reasonable doubt." We have rejected identical arguments before, however. "As long as the punishment charge properly requires the State to prove the special issues, other than the mitigation issue, beyond a reasonable doubt, there is no unfairness in not having a burden of proof instruction concerning extraneous offenses." *Ladd v. State*, 3 S.W.3d at 574–575. We overrule appellant's third point of error.

Appellant has shown no reversible error. Accordingly, we affirm the judgment of the trial court.

PRICE, J., joined the judgment, but not the opinion, of the Court.