In The
Court of Appeals
Sixth Appellate District of Texas at Texarkana

______________________________

No. 06-03-00051-CR
______________________________


ROBERT OWEN CHANCELLOR, Appellant
 
V.
 
THE STATE OF TEXAS, Appellee


                                              

On Appeal from the 6th Judicial District Court
Lamar County, Texas
Trial Court No. 19023


                                                 



Before Morriss, C.J., Ross and Carter, JJ.
Opinion by Justice Ross


O P I N I O N

          Robert Owen Chancellor appeals from his conviction by a jury for aggravated
robbery, with a deadly weapon finding, and with a finding of true for two prior felony
convictions. The jury assessed punishment at eighty years' imprisonment. In several
points of error, Chancellor raises one jury charge instruction issue and also complains he
received ineffective assistance of counsel. 
Background
          The sufficiency of the evidence is not raised. For context, however, we briefly
summarize the evidence. A man came into a shop and robbed the female shopkeeper at
knifepoint. A female customer came in during the robbery. The robber stabbed this
customer with the knife as he was forcing her into a bathroom to lock her up with the
shopkeeper. In the meantime, the shopkeeper called the police on a cordless telephone. 
Both the shopkeeper and the customer identified Chancellor as the robber at trial. The
descriptions given by both witnesses to police, however, varied on several points from
Chancellor's actual appearance.
Jury Instruction on Good Conduct Time
          Chancellor first contends the trial court erred by giving a jury instruction about good
conduct time when he was not eligible for the application of any such credit to his
sentence. He contends that, given the fact he was not eligible for good conduct time, the
information provided to the jury was at best irrelevant, and at worst positively misleading
because he was not eligible for mandatory supervision. See Tex. Code Crim. Proc. Ann.
art. 37.07, § 4(a) (Vernon Supp. 2004). The contention is necessarily based on alleged
violations of due process and fairness. An "as applied" challenge asserts that, as applied
to a defendant in his or her situation, the statute is unconstitutional. Bynum v. State, 767
S.W.2d 769, 774 (Tex. Crim. App. 1989); Parker v. State, 119 S.W.3d 350 (Tex.
App.—Waco 2003, no pet. h.); Legere v. State, 82 S.W.3d 105, 111 (Tex. App.—San
Antonio 2002, pet. ref'd).
          As acknowledged by counsel, the Texas Court of Criminal Appeals has recently
addressed the issue and held there is no "as applied" violation of due process under either
the United States or Texas Constitution when a charge recites the statute as directed by
the Legislature. Luquis v. State, 72 S.W.3d 355, 364–65 (Tex. Crim. App. 2002). Thus,
whether the statute actually applies, could apply, or, as in this case, absolutely could not
apply—and thus arguably be affirmatively misleading to the jury—a trial court does not err
by giving the statutory charge. We note that the charge in this case comes close to
conforming to the statutory language, except that one phrase was omitted from the last
paragraph: 
You may consider the existence of the parole law and good conduct
time. However, you are not to consider the extent to which good conduct
time may be awarded to or forfeited by this particular defendant. You are not
to consider the manner in which the parole law may be applied to this
particular defendant.

(Lined out section was omitted from the instruction.) 

          The court in the Luquis opinion considered: (1) the instruction in the context of the
entire charge; (2) whether the record showed the jury discussed, considered, or attempted
to apply what it was told about good conduct time and parole; (3) that the record did not
give any indication, such as a jury note, that the jury was confused about the possible
application of good conduct time in the case; and (4) the punishment the jury assessed. 
Id. at 366–67. The court also relied on the precept stating that a reviewing court may
assume a jury followed its instructions. Id. at 366. The court concluded Luquis had not
shown the instruction was "calculated to mislead this jury or that there is a reasonable
probability that it did mislead this jury." Id. at 367. It was not error, therefore, to submit the
instruction, and the submission did not violate due process. Id. at 368.



          Applying the Luquis factors to the record and charge in this case, there is no
principled reason to distinguish that situation from this one. The instruction given in this
case actually omitted the statutory language that tells the jury it may consider the existence
of the parole law and good conduct time. But, by the same omission, the instruction
affirmatively told the jury it may consider (instead of not to consider, as required by the
statute) "the existence to which [sic] good conduct time may be awarded to or forfeited by
this particular defendant." The syntax of this instruction suggests the omission was a
scrivener's error rather than an intentional omission. Nonetheless, the instruction did
inform the jury, in accordance with the statute, that it was not to consider the manner in
which the parole law may be applied to this particular defendant. We, like the Texas Court
of Criminal Appeals in Luquis, assume the jury followed this instruction. See id. at 366. 
Further, Chancellor has not directed us anywhere in the record showing that the jury
discussed, considered, or attempted to apply what it was told about good conduct time and
parole, or showing any indication the jury was confused about the possible application of
good conduct time in the case. And, while the punishment assessed was on the high end
of the scale, the jury did not assess life imprisonment as requested by the State. 
          Applying the Luquis factors, we are constrained to conclude there was no
demonstration of a violation of due process "as applied" in the instruction given. 
Chancellor's related points of error are overruled. 
Ineffective Assistance of Counsel
          Chancellor next contends trial counsel was ineffective. The standard of testing
claims of ineffective assistance of counsel is set out in Strickland v. Washington, 466 U.S.
668 (1984). To prevail on this claim, an appellant must prove by a preponderance of the
evidence (1) that his or her counsel's representation fell below an objective standard of
reasonableness, and (2) that the deficient performance prejudiced his or her defense. Id.
at 687; Rosales v. State, 4 S.W.3d 228, 231 (Tex. Crim. App. 1999). To meet this burden,
the appellant must prove that his or her attorney's representation fell below the standard
of prevailing professional norms and that there is a reasonable probability that, but for the
attorney's deficiency, the result of the trial would have been different. Tong v. State, 25
S.W.3d 707, 712 (Tex. Crim. App. 2000). Under this standard, a claimant must prove that
counsel's representation so undermined the proper functioning of the adversarial process
that the trial cannot be relied on as having produced a just result. Strickland, 466 U.S. at
686. 
          Our review of counsel's representation is highly deferential; we indulge a strong
presumption that counsel's conduct falls within a wide range of reasonable representation. 
Strickland, 466 U.S. at 689; Tong, 25 S.W.3d at 712. This Court will not second-guess
through hindsight the strategy of counsel at trial, nor will the fact that another attorney
might have pursued a different course support a finding of ineffectiveness. Blott v. State,
588 S.W.2d 588, 592 (Tex. Crim. App. 1979). That another attorney, including appellant's
counsel on appeal, might have pursued a different course of action does not necessarily
indicate ineffective assistance. Harner v. State, 997 S.W.2d 695, 704 (Tex.
App.—Texarkana 1999, no pet.). Any allegation of ineffectiveness must be firmly founded
in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. 
Thompson v. State, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999).
          As far as strategic or tactical reasons for counsel's action or inaction, in the absence
of direct evidence of counsel's reasons for the challenged conduct, an appellate court will
assume a strategic motivation if any can be imagined. Garcia v. State, 57 S.W.3d 436,
440 (Tex. Crim. App. 2001). We will not conclude the challenged conduct constitutes
deficient performance unless the conduct was so outrageous no competent attorney would
have engaged in it. Id.; see Thompson, 9 S.W.3d at 814. 
          Chancellor contends counsel was ineffective because he 1) unnecessarily
impeached his own witness (Chancellor's wife); 2) failed to object to nonresponsive
answers from the victims (that they told their story in narrative form without objection);
3) failed to object to the "good conduct" instruction issue discussed above; and 4) did not
effectively cross-examine the witnesses about the differences between their descriptions
of the robber and his actual appearance.
          Impeaching of own witness
          Trial counsel asked Chancellor's wife if she had ever had a criminal charge brought
against her. She replied yes, that in 1991 her boyfriend (not Chancellor) had some
marihuana seeds, and she and her boyfriend were both taken to jail. There is no indication
of a final conviction, and possession of marihuana has been held to not be a crime of
moral turpitude. See Ortiz v. Furr's Supermarkets, 26 S.W.3d 646, 655 (Tex. App.—El
Paso 2000, no pet.). Even had there been a final conviction, the charge would have been
a misdemeanor, not one of moral turpitude, and impeachment would be improper. See
Tex. R. Evid. 609(a). Further, the only date elicited concerning this offense was one over
twelve years before trial. See Tex. R. Evid. 609(b). Thus, it appears certain the State
could not have used this evidence to impeach the witness. The trial tactic of bringing the
bad out first before the state has an opportunity to do so is not applicable. 
          It is possible, however, that, for reasons known only to Chancellor's counsel, it was
important for the jury to know that the witness did not otherwise have a criminal record of
any sort, that her single arrest was over eleven years ago, and that it was actually for
something her then-boyfriend had in their house. Under the extremely lenient standard of
Strickland, we cannot conclude this was necessarily error from this record, and even if it
were, it is not, standing alone, sufficiently destructive to undermine our confidence in the
adversarial system. 
          Narrative testimony
          Chancellor next complains counsel did not object to answers by the State's
witnesses that turned into narrative soliloquies instead of maintaining the question/answer
format that is appropriate to the examination of a witness. Counsel directs our attention
to four specific instances where, after being asked a generic question about the sequence
of events that occurred during the robbery, the shopkeeper, Karie Raulson, was permitted
to speak without interruption for extended periods of time. In the two lengthiest narratives,
Raulson described the events of the robbery in graphic detail. 
          It is apparent counsel did allow the victim to "tell her story" at great length, without
making any effort to require the State to elicit the information in a question/answer format. 
Arguably, her narrative testimony was more emotionally gripping than it would have been
had her account been in question/answer form. 
          Nevertheless, there are several reasons why counsel might have decided to allow
the testimony to continue without objection. He could have thought that to allow the State
to form its questions would simply extend the amount of time the jury would be exposed
to the particular evidence, and therefore increase the emphasis on the evidence, or that
he would unnecessarily irritate the jury by continually interrupting the obviously emotional
testimony of the victim while she relived an armed attack. It is reasonable to think that
counsel would not want to make the victim any more sympathetic than she already was,
or possibly that he remained silent in hopes she would forget some portion of the event in
the absence of continual pointing by the State at the desired information. 
          We find this tactic by trial counsel, like whatever tactic prompted him to impeach his
own witness, of highly questionable value. It is not one, however, we can entirely
disregard. And again, under the extremely lenient standard of Strickland, we cannot
conclude from this record this was necessarily error or actions taken without reason, and
even if it were, it is not, standing alone, sufficiently destructive to undermine our confidence
in the adversarial system. 
          The good-conduct instruction that could not apply to this case
          We have already discussed the "good-conduct" instruction. As giving the instruction
was not error, counsel's failure to object was not error, and we need not consider that
matter.
          Ineffective cross-examination on identity
           Chancellor finally complains trial counsel's cross-examination was inadequate in
connection with the testimony identifying him as the robber. This contention is largely
based on areas that appellate counsel does not believe were adequately explored. 
          The contemporaneous descriptions of the robber by the two victims were not
consistent in several respects. The shopkeeper, Raulston, described the robber as a white
male, fifty-three years old, 5'6" to 5'8" tall, slim, with gray wavy hair that was combed back,
and with a full gray mustache. She said his teeth were stained and dirty. The customer,
Jenna Hackney, described the robber as forty-five years old, 5'10" tall, thin, with puffy gray
hair combed back and a teardrop-shaped mole near his right eye. The evidence showed
Chancellor was actually thirty-nine years old, between 6'2" and 6'3" tall, had two missing
front teeth, and had never had a mustache. 
          Chancellor had an alibi, in the form of a telephone call to his employer, on the day
of the robbery, stating he was not coming to work because of illness. His wife testified he
was at home in bed when she arrived home from work at 3:45 p.m. on the day of the
robbery. She also testified he had two missing front teeth. 
          Chancellor's former employer, Elizabeth Anthony of Anthony Roofing, and a
coworker, Debbie Nelson, both testified Chancellor had never had a mustache. 
          Counsel first points out a lack of cross-examination about the existence of a
mustache. Raulson described the attacker as having a gray mustache. Hackney was not
asked whether she had described him as having a mustache, and counsel did not question
the officer who had created a computer composite sketch based on Hackney's description
as to why no mustache appeared on the composite. However, counsel did later point out
the discrepancy between Raulson's testimony that Chancellor had a mustache and the
other evidence that he had never had a mustache. Appellate counsel also argues trial
counsel should have more vigorously pointed out the mismatch in the victims' descriptions
of the robber, despite their similar opportunities to observe him at extremely close range. 
 
          Counsel also points out that the victims were not asked whether the composite
looked like the assailant and that trial counsel did not address whether there was
agreement between the victims that the attacker had a "teardrop shaped mole" or tattoo
under one eye, or why the police went looking for someone with two tattoos instead of one. 
          The missing front teeth were also of some interest, since that would be quite visible. 
Raulson had described the robber as having "stained" teeth, but then was never asked
whether he had all of them. Counsel also did not ask Hackney about his teeth or lack
thereof.
          It appears all these areas were appropriate for more questions than were asked by
trial counsel. However, in the absence of any information to reflect what the answers to
these questions would have been, it is difficult for a reviewing court to conclude counsel
erred by failing to ask them. Without this information, we can only recognize that the
answers could as easily have been harmful as helpful to the defendant. 
          When ineffective assistance is raised on direct appeal, appellate counsel and the
court must proceed on a trial record not developed for the object of litigating or preserving
the claim and thus often incomplete or inadequate for this purpose. Freeman v. State,
No. 2156-01, 2003 WL 22510582 (Tex. Crim. App. Nov. 5, 2003). Although some claims
may be disposed of on direct appeal where "trial counsel's ineffectiveness is so apparent
from the record," Massaro v. United States, 538 U.S. 500 (2003); Freeman, 2003 WL
22510582, it appears from the court's statements that such situations are quite rare. See
Freeman, 2003 WL 22510582.
          We cannot conclude under this record that counsel's actions were necessarily error
or actions taken without reason. Even if they were, they are not sufficiently destructive to
undermine our confidence in the adversarial system. The contention of error is overruled.
          We affirm the judgment.
 

                                                                           Donald R. Ross
                                                                           Justice

Date Submitted:      February 5, 2004
Date Decided:         February 18, 2004

Do Not Publish