# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-07-00472-CR

**Sean Allen Harrison, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 299TH JUDICIAL DISTRICT
### NO. D-1-DC-06-300938, HONORABLE CHARLES F. BAIRD, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury found appellant, Sean Allen Harrison, guilty of one count of aggravated sexual assault. *See* Tex. Penal Code Ann. § 22.021(a)(1)(A)(i) (West Supp. 2009). The trial judge assessed punishment at twenty-seven years' confinement. Harrison challenges his conviction, asserting that he received ineffective assistance of counsel. We affirm the trial court's judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

Harrison and A.B. had an "on again/off again" romantic relationship that began in 2001, when both were high school seniors. In mid-March 2006, A.B. ended the relationship. A.B. testified that she attempted to maintain a friendship with Harrison, but that she "realized that was not going to work" because Harrison called her every day and she "didn't want to give updates on where [she] was or who [she] was hanging out with." Some time in early- to mid-April, A.B. attempted to end her friendship with Harrison, and told him that she "did not want to speak

with him . . . did not want any sort of contact with him . . . didn't want him in [her] life anymore." Nonetheless, Harrison continued to send her text messages and emails.

On April 22, A.B. made plans to meet a friend, Robert DeSeguera, to dance at Plush, a club in Austin's Sixth Street entertainment district that she frequented regularly. Before heading out for the evening, A.B. received a text message from Harrison saying "something along the lines of, I will find you tonight." A.B. testified as to her reaction to this text message: "I was always scared of him, so there was the initial fear. But I was to the point that I was fed up and I didn't want my life to be affected or controlled anymore." A.B. met DeSeguera as planned. When Plush closed at 2:00 a.m., A.B., DeSeguera, and DeSeguera's friend walked west on Sixth Street towards DeSeguera's car. Because all of the bars had just closed, Sixth Street was very crowded, and A.B., DeSeguera, and his friend walked single file through the crowd. After walking two to three blocks, A.B. felt a jerk on her arm. Harrison, who "seemed intoxicated" and "very aggressive," said to A.B., "I told you I would find you. You need to come with me. We need to talk." A.B. testified that she told Harrison, "no, I'm not your girlfriend anymore. Leave me alone," but that he started pulling her towards Seventh Street. Although she broke free and ran at one point, Harrison caught up with her, picked her up from behind, and continued towards Seventh Street, carrying her about twenty feet to his car. A.B. screamed and struggled, but the area was loud and "no one seemed to notice." DeSeguera testified that he saw Harrison grab A.B., and that she "looked really scared," but that Harrison and A.B. then disappeared into the crowd.

At the car, Harrison pulled out a knife, pointed it at A.B.'s mid-section, and forced her into the car. Harrison proceeded to yell and slap A.B. as he drove, ultimately arriving at the

2

southwest Austin home of his friend, Andrew "Drew" Driden. Harrison pushed her into the house at knife-point and took her into the bedroom where he was staying. He told A.B. he was going to kill himself that night, lifted up the mattress, and pulled out a shotgun. Harrison pushed A.B. onto the bed and put the barrel of the gun against her face. He removed A.B.'s skirt and underwear and began taking photographs of her with a digital camera. Harrison then sexually assaulted A.B. After the assault, Harrison got dressed and continued to yell and threaten to kill himself and A.B. He hit her with her cell phone and the gun. He wrote "mine" on one shotgun shell and asked her to write her name on another, then loaded the gun with both shells. A.B. tried to calm Harrison down. Eventually he began getting tired and laid down on the bed with her. A.B. then told Harrison that her car was parked downtown and was going to get towed. Around 5:00 or 6:00 a.m., Harrison drove A.B. back to her car. A.B. drove home, went to sleep, and reported the assault to her parents later that day. A.B.'s parents contacted the police.

Harrison was charged with two counts of aggravated sexual assault, to which he pleaded not guilty. At trial, Harrison's counsel elicited testimony from A.B. regarding several prior bad acts by Harrison including: an altercation at the home of James Ryan Pace in March 2002 that resulted in the police being called; an altercation in Harrison's vehicle in August 2002 during which Harrison beat A.B.; Harrison's arrest in September 2002 for assaulting A.B. in a movie theater; Harrison's arrest in January 2003 for assaulting his father during an altercation with A.B. at Harrison's parents' home; Harrison's arrest in June 2005 for bringing a suicide note addressed to A.B. and a loaded semi-automatic pistol to the home of A.B.'s friend; Harrison's arrest in June 2005

3

for telephone harassment and threats against A.B.; and Harrison's arrest in March 2006 for assaulting a roommate.

On redirect examination, the prosecutor questioned A.B. about the details of several of these incidents. In addition, the prosecutor subsequently called four witnesses who further elaborated on some of these incidents: Pace; Phillip James Warner, a witness to the movie theater assault; the Travis County Sheriff's Deputy who responded to the incident involving the suicide note; and the Hays County Sheriff's Deputy who responded the harassment incident. Defense counsel requested and obtained a limiting instruction for the testimony of each of these witnesses instructing the jury that it could consider their testimony for the limited purpose of rebutting a defensive theory.

After hearing the evidence, the jury found Harrison guilty of one count of aggravated sexual assault for causing the penetration of the victim's sexual organ with his sexual organ without her consent and using or exhibiting a deadly weapon during the commission of the offense. The court then imposed a sentence of twenty-seven years' confinement. Harrison filed a motion for new trial; however, the motion did not raise ineffective assistance of counsel, and no hearing was held. In his sole issue on appeal, Harrison argues that he received ineffective assistance of counsel because his attorney elicited harmful extraneous offense and prior bad acts evidence that otherwise would have been excluded, thereby opening the door to additional damaging evidence from the State.

## DISCUSSION

A defendant is constitutionally entitled to reasonably effective assistance of counsel. *Stafford v. State*, 813 S.W.2d 503, 506 (Tex. Crim. App. 1991). However, this constitutional right does not mean that a defendant is entitled to errorless counsel or counsel whose competency is

4

judged by hindsight. *Id*. We evaluate claims of ineffective assistance of counsel against the standard set forth in *Strickland v. Washington*. *See* 466 U.S. 668, 687 (1984); *Hernandez v. State*, 988 S.W.2d 770, 774 (Tex. Crim. App. 1999). In deciding a claim of ineffective assistance of counsel, we must determine whether an attorney's performance was deficient and, if so, whether that deficiency prejudiced the defense. *Strickland*, 466 U.S. at 687; *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999). An attorney's performance is deficient if it falls below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688; *Thompson*, 9 S.W.3d at 812. Deficient performance is prejudicial when, but for the attorney's unprofessional conduct, there is a reasonable probability that the outcome of the proceeding would have been different. *Strickland*, 466 U.S. at 694; *Thompson*, 9 S.W.3d at 812. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Thompson*, 9 S.W.3d at 812.

It is the defendant's burden to prove ineffective assistance of counsel by a preponderance of the evidence. *Thompson*, 9 S.W.3d at 813. In determining whether an attorney's performance was deficient, we apply a strong presumption that the attorney's conduct was within the wide range of reasonable professional assistance. *Id*. at 813. We review the effectiveness of counsel in light of the totality of the representation and the circumstances of each case. *Id*.

In most cases, an undeveloped record on direct appeal is insufficient to satisfy the requirements of *Strickland* because the reasonableness of counsel's decisions often involves facts not appearing in the appellate record. *Rylander v. State*, 101 S.W.3d 107, 110 (Tex. Crim. App. 2003). Without evidence of the strategy and methods involved concerning counsel's actions at trial, an appellate court should presume a sound trial strategy. *See Thompson*, 9 S.W.3d at 814. Where, as here, an allegation of ineffective assistance of counsel is not raised in a motion for new trial,

5

trial counsel has no opportunity to explain his conduct, and absent such opportunity, an appellate court should not find deficient performance unless the challenged conduct was "so outrageous that no competent attorney would have engaged in it." *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005) (quoting *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001)).

Harrison complains that his counsel improperly "opened the door" to damaging evidence when he elicited testimony from A.B. regarding extraneous offenses and prior bad acts that otherwise would have been excluded. Evidence of a person's character is generally not admissible for the purpose of proving action in conformity therewith on a particular occasion. Tex. R. Evid. 404(a). An exception to this general rule is evidence of the character of the accused in a criminal case offered by the accused or offered by the prosecution in rebuttal. *Id*. 404(a)(1)(A). Likewise, evidence of other crimes, wrongs, or acts by a defendant are not admissible to prove the character of a person in order to show conformity therewith, but may be admissible for other purposes such as proof of motive, opportunity, intent, absence of mistake or accident, or to rebut a defensive theory. Tex. R. Evid. 404(b); *Powell v. State*, 63 S.W.3d 435, 439 (Tex. Crim. App. 2001). Harrison argues that due to his attorney's repeated references to his extraneous offenses and prior bad acts, he was portrayed throughout the guilt-innocence phase of the trial as being a dangerous, volatile, violent individual, which prejudiced the jury against him in weighing all of the other evidence. He contends that this constitutes ineffective assistance of counsel because defense attorneys normally go to great lengths to exclude extraneous offenses and prior bad acts and that his counsel "went to great lengths to allow it in." We disagree.

Harrison does not present any record of his counsel's decision to elicit extraneous offense or prior bad act testimony from A.B. or any evidence showing that this decision was not part

6

of a reasonable trial strategy. In fact, Harrison notes that "the only possible strategic explanation" for his counsel's decision to elicit extraneous offense or prior bad act testimony from A.B. was to rebut the state's evidence of flight from the police by showing that Harrison "has always been wronged by the police." When counsel introduced evidence related to Harrison's March 2006 assault arrest and the prosecutor objected to relevance, counsel explained:

> COUNSEL: The relevance is that as you've seen from prior testimony, there is a long history of Mr. Harrison's relationship with the police in which he has—he's actually the wronged party who is getting arrested and he gets arrested for hitting his father when his father is the one that hit him. His father asks for the end of the prosecution. The prosecution pays no attention. He gets arrested for assaulting [his roommate] when the fact of the matter is that he's the one who is being assaulted.
>
> . . . .
>
> COUNSEL: Judge, one aspect of relevance, we believe, is that the State is going to try to show evidence of flight from the police. We believe to rebut or explain the reason for flight in that he's always been wronged by the police and he has no reason to believe the police are going to do the right thing by him. Therefore, relevance is going to be for rebuttal.

This does not constitute evidence to overcome the presumption that counsel's strategy and methods at trial were sound, *see Thompson*, 9 S.W.3d at 814, and if anything, when considered in the context of the record as a whole points to a reasonable effort by counsel to rebut anticipated evidence of flight.

The testimony Harrison's counsel elicited regarding Harrison's extraneous offenses and prior bad acts supported his main defensive theory throughout the trial—consent. Counsel sought to show that the relationship between Harrison and A.B. was volatile and sexual, and that

they often fought and reconciled by having sex. In his opening argument, Harrison's counsel told the jury:

> The evidence will show that this relationship was a very hot relationship. It was a very sexual relationship. They both enjoyed each other sexually and romantically, but they also were very—also fought. And they were very jealous of each other . . . . And you will see, when the evidence all comes in, that all that happened on that night in question was what happened time and time again throughout the whole six years, that it was a question of make-up sex.

Counsel made similar arguments at the in-camera hearing that the trial judge conducted pursuant to Texas Rule of Evidence 412(c) prior to A.B.'s testimony. Counsel proffered that prior sexual conduct between Harrison and A.B. was relevant because "every time they broke up and had a disagreement or something like that they would get together and have make-up sex and that was the way they—that was their regular procedure." These arguments show counsel's attempt to show that the events of April 23, 2006, were in conformity with Harrison and A.B.'s history—fighting followed by "make-up sex." The testimony regarding extraneous offenses and prior bad acts that counsel elicited from A.B. could reasonably support this defensive theory by showing the volatile and violent nature of their relationship. Thus, Harrison has not rebutted the presumption that counsel's decision was the product of sound trial strategy, and we cannot conclude that counsel's performance was deficient. *Thompson*, 9 S.W.3d at 813-14.

Even if counsel's performance was deficient, the record does not show that but for counsel's actions, the trial outcome would have been different. The record shows overwhelming evidence was presented to the jury that tended to refute Harrison's only defense—that A.B. consented to sexual intercourse with him on April 23, 2006—and that corroborated A.B.'s testimony.

Such evidence included: the testimony of the sexual assault nurse examiner ("SANE"); a body diagram from A.B.'s SANE examination; photographs of abrasions on A.B.'s face and arm; photographs taken of A.B. on April 23, 2006, found on Harrison's flash drive; testimony from an Austin Police Department DNA analyst that Harrison was the source of the sperm cell fraction of A.B.'s SANE examination vaginal swab; the shotgun, testimony from an Austin Police Department latent print examiner that Harrison's fingerprints matched the fingerprints found on the shotgun; and the shotgun shells that had "mine" and A.B.'s name written on them as A.B. described. We overrule Harrison's sole issue.

## CONCLUSION

Having overruled Harrison's sole issue on appeal, we affirm the trial court's judgment of conviction.

_____

David Puryear, Justice

Before Chief Justice Jones, Justices Puryear and Henson

Affirmed

Filed: November 13, 2009

Do Not Publish

9