

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-19-00313-CR

_____

MILES WESLEY KENNEY, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 415th District Court
Parker County, Texas
Trial Court No. CR17-0059

---

Before Birdwell, Womack, and Walker, JJ.
Memorandum Opinion by Justice Womack

## MEMORANDUM OPINION

### I. INTRODUCTION

Appellant Miles Wesley Kenney appeals his conviction and resulting seventeen-year sentence for evading arrest or detention with a vehicle. In three points, Kenney argues (1) that the trial court erred by not including his requested deadly weapon instruction in the jury charge, (2) that he received ineffective assistance of counsel, and (3) that the trial court erred by not conducting a hearing on his motion for new trial. We affirm.

### II. BACKGROUND

Based on a warrant, police officers arrested Kenney on January 11, 2017, for the offense of evading arrest or detention with a vehicle because of events that occurred on November 12, 2016. According to Kenney, prior to trial, the State offered him a sentencing and charge plea wherein his conviction would not contain a deadly weapon finding, and he would receive fifteen years' incarceration. On the advice of counsel, Kenney rejected the plea. Later, Kenney entered a plea of guilty to one count of evading arrest or detention, pleaded true to the State's enhancement paragraphs, and, without a sentencing recommendation from the State, elected to

have a jury assess his punishment. At trial,[1] the State offered evidence regarding the issue of whether Kenney had used his vehicle as a deadly weapon.

## A. Deputy Calvin Bradley Chane

Deputy Calvin Bradley Chane, a field training officer for the Parker County Sheriff's Office, testified at the trial. Chane said that he was patrolling with Deputy Anthony Sheridan on November 12, 2016, around 7:30 a.m., when he observed a white car parked partially on the shoulder and partially on the gravel area of a road in Parker County. Kenney was sitting in the car. Chane called dispatch and reported he would be participating in "a motorist assist." According to Chane, as he exited his vehicle to make contact with Kenney, he noticed "a lot of movement from the driver" who "appeared . . . slumped over the steering wheel." As Chane approached the car, its brake lights came on and off, and then the "vehicle took off." Chane testified that Kenney entered nearby Interstate Highway 20 at a high rate of speed.

As he pursued Kenney, Chane learned from dispatch that the vehicle had been reported stolen. Chane described Kenney's driving as constantly being at a high rate of speed, disobeying traffic laws, exiting and entering the interstate at high rates of speed, "blowing through a lot of stop signs," and possessing a total disregard for any other motorists.

---

[1]When a defendant pleads guilty, the defendant is not eligible for a bifurcated trial, so there is no per se punishment phase. There is, instead, a unitary trial. *Carroll v. State*, 42 S.W.3d 129, 131–32 (Tex. Crim. App. 2001).

By Chane's account, because the high-speed chase stretched from Parker County into Tarrant County, he received assistance from officers of other jurisdictions in his pursuit. As the chase occurred, Sheridan continuously relayed information to dispatch regarding the chase's locations. Eventually, Kenney exited the interstate for a final time, raced through a residential neighborhood, crashed his car onto an embankment in front of an apartment complex, left his car, and took off running. Kenney then jumped a fence, and Chane was unable to apprehend him.

According to Chane, he then searched the car. One of the things Chane noticed while searching the car is that the vehicle's identification number did not match all parts of the car. He also found a number of tools, including a set of large bolt cutters that Chane testified were used in crimes involving entering a gate or cutting a chain, fence, or bolt. Chane said that he also found a disassembled bicycle in the trunk.

Regarding the chase overall, Chane confirmed that Kenney had driven at approximately 110 miles per hour at times. Chane further testified that as the chase ensued, he could see Kenney "trying to reach and put things under the floorboard and grab a hold of things in the passenger's side and a lot of movement in the vehicle." Chane described Kenney's movements in the car as "definitely . . . dangerous." When asked whether the vehicle that Kenney was driving, given the manner in which he had driven it, could have caused death or serious bodily injury to Kenney or somebody else, Chane agreed that it could.

4

On cross-examination, Chane said that his normal routine if a pursuit becomes dangerous to himself or others is to end the pursuit. Although Chane said that Kenney did appear to run someone off the road, he also said that in his opinion no one was in danger. On redirect, however, Chane agreed that he did not know at any given time what Kenney would do, including not knowing if Kenney would cut in front of one of the many 18-wheelers he passed, if he was going to sideswipe another vehicle, if he was going to clip the back of a vehicle and make it turn around, if he was going to hit a sign pole as he darted across lanes of traffic, or if he was going to hit somebody when he ran through a stop sign or red light. Chane acknowledged that each of those actions was dangerous on Kenney's part.

## B. Video and Audio of the High-Speed Chase

The State published the video captured from Chane's in-car camera, which depicted the incident from the time Chane pulled in behind Kenney's car until after Kenney had fled on foot. In the video, Chane can be seen exiting his patrol vehicle, and as Chane approached the front of Kenny's vehicle, the car's brake lights came on and off, and then Kenney abruptly took off and raced onto the interstate. It took Chane more than one minute to eventually come up directly behind Kenney. At multiple times during the chase, Kenney exited the interstate and drove onto the frontage road and through intersections without stopping at stop signs or stoplights and then reentered the interstate at a high rate of speed. At different times, as Kenney would approach traffic, either on the interstate or the frontage road, he

5

caused multiple vehicles to veer and brake in an attempt to avoid being struck. On one occasion, as Kenney reentered the interstate, he drove directly in front of a vehicle that was also attempting to enter the interstate, causing the vehicle to brake and swerve. During another moment, Kenney drove between an 18-wheeler and another vehicle, only to encounter a second 18-wheeler driving directly beside another car in the other lane. Trapped by the traffic, Kenney raced onto the lefthand shoulder and passed the traffic, forcing all the vehicles in the area to move to the right. He repeated similar acts multiple times during the nearly twenty-minute chase.

At another instance, Kenney raced around the righthand side of a vehicle that was obstructing his travel, and the vehicle attempted to move to the right unaware that Kenney was going to race around him on that side, which caused the vehicle to take evasive action. As the chase continued, one of the officers in the car can be heard reporting that Kenney was traveling at speeds in excess of 110 miles per hour. Throughout the chase, Kenney drove between numerous vehicles multiple times, all the while racing down the interstate.

Some of the times when Kenney would exit the interstate and drive onto the frontage road, his vehicle would strike the grass and gravel, causing debris to fly in the air. Roughly eleven minutes into the chase, another police vehicle approached and attempted to block Kenney. Kenney's response was to swerve to the right across three interstate lanes and pass several cars using the righthand shoulder. As the

second patrol vehicle again tried to get ahead of Kenney, Kenney feigned he was going to exit only to swerve sharply back onto the interstate and accelerate.

Sixteen minutes into the chase, Kenney exited the interstate for good. As he did, he again struck a graveled median and nearly collided with another vehicle on the frontage road. Shortly after, Kenney took a right turn onto a main thoroughfare and into a business district. Seconds later, Kenney slammed on his brakes, turned into a gas station parking lot, crossed the parking lot, and exited the lot into a residential area. As he drove down the neighborhood street, Kenney drove in and out of oncoming traffic and again ignored stop signs. Roughly nineteen minutes into the chase, Kenney crashed his car over a curb and onto an embankment in front of an apartment complex, exited his car, and then fled. Later, Chane attempted to turn off the car, and he discovered that Kenney had left the car in neutral. Consequently, Kenney's vehicle almost slid back down the embankment and into Chane's patrol vehicle.

While Chane was on the stand, the State also published an audio recording of the communications between Chane and dispatch after Kenney had fled from the car. In the audio, Chane stated that Kenney had hopped over a fence and onto another property. He described Kenney as having long hair and a goatee and wearing a white shirt and black shorts.

## C. Kenney's Prior Criminal History

At trial, the State also introduced ten judgments showing that Kenney had previously been convicted of unauthorized use of a motor vehicle, two counts of burglary of a habitation, two counts of driving with an invalid driver's license, burglary of a building, possession of methamphetamine, theft of a vehicle, criminal trespass of a habitation, and evading arrest. The State also elicited testimony from witnesses who averred that on December 10, 2017, Kenney was caught shoplifting. Police arrested Kenney that day, and while searching him, found a straight razor blade, a syringe, stolen checks, stolen social security documents, and a partial driver's license that did not belong to Kenney.

## D. Crime Scene Technician Heather Lee Huffman

Heather Lee Huffman, a crime scene technician with the Parker County Sheriff's Office, said that she processed[2] the vehicle Kenney was driving the day he evaded police. As the State introduced pictures that Huffman had taken of the vehicle, she described what the pictures portrayed. One of the items Huffman found was an eyeglass case that contained two syringes, a tiny mug, a rubber band, and two separate pieces of crystallized cotton. Huffman said that the crystal substance found in the cotton was methamphetamine.

---

[2]According to Huffman, "processing" a vehicle involves looking "for any evidence that will link it to a suspect such as fingerprints, DNA, any items, identifying items, things like that."

### E. Kenney's Testimony

Kenney testified in his own defense. Kenney told the jury how he had been involved in a custody dispute between his parents when they divorced when he was four years old. When Kenney was fourteen, his father, whom he lived with, was paralyzed in a car wreck, and Kenney had to take care of his father who was then confined to a wheelchair. Kenney said that after his father's wreck, he began to get "into a lot of trouble," do drugs, and run around with the wrong people.

By Kenney's account, the first drug he used was marijuana, but his drug use rapidly escalated and by the time he was fifteen years old he was "smoking speed and snorting coke." Kenney also started committing crimes and was placed on probation for two counts of burglary of a motor vehicle and criminal trespass when he was fifteen. Kenney said that the criminal trespass was the result of his failed attempt at robbing a store with a gun. Kenney also was charged with evading arrest or detention on foot around the same time. According to Kenney, because of the trouble he got into, he never graduated from high school. In 2005, Kenney was charged with three counts of burglary of a habitation and ended up serving time in prison. Kenney said he was paroled, but that he broke off his ankle monitor and was eventually arrested on the parole violation and sent back to prison. When he was later released, he again was arrested for burglary of a habitation and spent several months in the Tarrant County jail. Kenney described how, when he was released from jail, he "was doing pretty well" for a few years maintaining a steady job and being in a relationship, but he

9

"started using again," and in 2014, he was arrested for theft of a vehicle and possession of methamphetamine. In 2016, Kenney was arrested for evading arrest on foot after he attempted to shoplift some items from a sporting goods store.

Kenney said that he did not steal the vehicle used in the police chase. Rather, by Kenney's account, he purchased it in front of a game room for "a little bit of drugs and a little bit of cash." Kenney said he suspected that the vehicle had probably been stolen.

Kenney admitted to driving "well over 100 miles an hour" during the chase, but he said that he tried neither to ram other vehicles nor to hit them. He also said that he passed vehicles on the shoulder because they were blocking him as he attempted to flee, but, according to Kenney, he "didn't feel it was dangerous the way [he] passed" the other cars. But Kenney did say that he recognized that he was "careless about other people's safety." Kenney also stated that he did not crash the vehicle, but purposely "ran up on the curb" so that he could flee on foot and scale a large fence that he knew was behind the apartment complex. Even though Kenney knew that police had his phone and knew who he was, he was not arrested until sometime later.

Kenney averred that he found the checks, social security documents, and partial driver's license in a "flop house" where he stayed sometimes. He also admitted that the eyeglass case containing the drug paraphernalia was his, and he was using methamphetamine daily at the time of the chase. By Kenney's account, most of the

tools found in the car belonged to him, and he would use the bolt cutters when he would steal. Kenney said that he was open to going to drug rehabilitation. Kenney stated that he had been in jail since his arrest for evading, had a newfound appreciation for law enforcement, and had become a trustee of the jail, which gave him responsibilities based on his good behavior.

## F. The Jury Charge, Sentence, and Appeal

After both the State and Kenney rested, the trial court discussed the jury charge with counsel. At the charge conference, Kenney requested that the following instruction be included regarding the jury's potential deadly weapon finding:

> In order to affirmatively find the use or exhibition of a deadly weapon, the evidence must demonstrate that:
>
> (1) The vehicle meets the definition of a deadly weapon;
>
> (2) The deadly weapon was used or exhibited during the felony offense on trial; and
>
> (3) People other than the defendant were put in actual danger.

The trial court denied Kenney's request. Instead, the trial court included the following language regarding a deadly weapon finding:

> Do you find beyond a reasonable doubt that the Defendant, Miles Wesley Kenney, used or exhibited a deadly weapon, to-wit: a motor vehicle, that in the manner of its use or intended use was capable of causing death or serious bodily injury during the commission of the offense alleged in the indictment?
>
> A "deadly weapon" means anything that in the manner of its use or intended use is capable of causing death or serious bodily injury.

11

"Serious bodily injury" means bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ.

"Motor vehicle" or "Vehicle" means a device that can be used to transport or draw persons or property on a highway.

After deliberations, the jury assessed punishment at seventeen years' incarceration and found the deadly weapon finding true. The trial court sentenced Kenney and rendered judgment accordingly, and this appeal followed.[3]

## III. DISCUSSION

### A. The Jury Instruction on Deadly Weapon

In his first point, Kenney argues that the trial court erred by not including his requested instruction in the jury charge—an instruction that tracks caselaw regarding evidentiary sufficiency review on a deadly weapon finding. *Drichas v. State*, 175 S.W.3d 795, 798 (Tex. Crim. App. 2005). The State counters that the "trial court did not err by refusing [Kenney's] request to include non-statutory caselaw pertaining to reviewing the sufficiency of the evidence in its deadly weapon instruction." We agree with the State.

#### 1. Standard of Review

We review a complaint of jury charge error under a two-step process. *Kirsch v. State*, 357 S.W.3d 645, 652 (Tex. Crim. App. 2012); *Ngo v. State*, 175 S.W.3d 738, 743

---

[3]On August 21, 2019, the Texas Court of Criminal Appeals issued a mandate granting Kenney this out-of-time appeal.

(Tex. Crim. App. 2005). First, we determine whether error occurred. *Ngo*, 175 S.W.3d at 743. Second, if we find error, we evaluate whether harm resulted from the error sufficient to require reversal. *Id.* (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g)). Jury charge error requires reversal when the defendant has properly objected to the charge and we find "some harm" to his rights. *Id.*

### 2. The Law Concerning Jury Charges

The purpose of the jury charge is to inform the jury of the applicable law and guide them in its application to the case. *Beltran De La Torre v. State*, 583 S.W.3d 613, 617 (Tex. Crim. App. 2019) (quoting *Hutch v. State*, 922 S.W.2d 166, 170 (Tex. Crim. App. 1996)). A trial judge must maintain neutrality in providing such information and guidance. *Brown v. State*, 122 S.W.3d 794, 798 (Tex. Crim. App. 2003). A trial judge may not express any opinion on the weight of the evidence or draw the jury's attention to particular facts. *Id.* at 798, 801. To accomplish this neutrality, Article 36.14 of the Texas Code of Criminal Procedure provides that a jury charge: (1) must be in writing, (2) must distinctly set forth the law applicable to the case, (3) cannot express any opinion as to the weight of the evidence, (4) may not sum up the testimony, and (5) cannot discuss the facts or use any argument in the charge calculated to arouse the sympathy or excite the passions of the jury. Tex. Code Crim. Proc. Ann. art. 36.14. This rule is designed to prevent a jury from interpreting a judge's comments as a judicial endorsement or imprimatur for a particular outcome.

13

*See Bartlett v. State*, 270 S.W.3d 147, 150 (Tex. Crim. App. 2008) ("[A] trial court should avoid any allusion in the jury charge to a particular fact in evidence, as the jury might construe this as judicial endorsement or imprimatur.").

As a general rule, a jury charge that tracks the language of a statute is "a proper charge on the statutory issue." *See Riddle v. State*, 888 S.W.2d 1, 8 (Tex. Crim. App. 1994). And a court should normally reject non-statutory instructions as improper comments on the weight of the evidence where such instructions are unnecessary to clarify the law and they also draw the jury's attention to a particular type of evidence. *See, e.g., Kirsch*, 357 S.W.3d at 652 (holding that an instruction defining "operate" in a DWI case was an impermissible comment on the weight of the evidence because it "improperly impinged on the jury's fact-finding authority by limiting the jurors' understanding of what evidence could constitute" the element of operating); *Brown*, 122 S.W.3d at 796, 802–03 (rejecting an instruction that "intent or knowledge may be inferred by acts done or words spoken" because while neutral, it improperly focused the jury's attention on evidence that might support a finding of criminal intent, told the jury how to consider certain evidence, and instructed the jury on a rule of appellate evidentiary sufficiency review).

### 3. Analysis

In this case, the jury charge tracked the statutory language of a deadly weapon finding and included statutory definitions of deadly weapon, serious bodily injury, and motor vehicle. *See* Tex. Penal Code Ann. §§ 1.07(a)(17)(B), (46), 32.34(a)(2). Thus,

14

the charge was a proper charge on the statutory issue of a deadly weapon finding. *See Riddle*, 888 S.W.2d at 8. Moreover, Kenney's requested charge that would have required the jury to find that "[p]eople other than [Kenney] were put in actual danger" because of the manner in which Kenney exhibited the vehicle while evading arrest is not found in a statute. Rather, it is a definition used by courts in judicial decisions when evaluating the sufficiency of the evidence to support a deadly weapon finding. *See Drichas*, 175 S.W.3d at 798. This added nonstatutory instruction would have been an improper comment on the weight of the evidence because it would have indicated to the jury that it should focus on Kenney's testimony that he did not think he was endangering anyone and Chane's testimony that he would have stopped pursuing Kenney if the chase had become dangerous to others. *See Beltran De La Torre*, 583 S.W.3d at 619 ("By highlighting one particular path to establishing the element of possession . . . the instruction focused the jury's attention on that particular type of evidence and impermissibly guided the jury's assessment of the evidence of possession."). Further, such an instruction was unnecessary to clarify the law of a deadly weapon finding. *Kirsch*, 357 S.W.3d at 652. We hold that the trial court did not err by denying Kenney's requested instruction; thus, we need not assess harm. *Ngo*, 175 S.W.3d at 743. We overrule Kenney's first point.

## B. Ineffective Assistance of Counsel

In his second point, Kenney argues that he received ineffective assistance of counsel when his trial attorney advised him to not take a more favorable plea and that

15

his attorney failed to properly prepare for trial. We conclude that because the record is silent as to Kenney's attorney's trial strategies, a direct appeal is the improper avenue to bring this claim.

The Sixth Amendment to the United States Constitution and Article I, Section 10 of the Texas Constitution afford criminal defendants the right to reasonably effective assistance of counsel. U.S. Const amend. VI; Tex. Const. art. I, § 10; *Yarborough v. Gentry*, 540 U.S. 1, 5, 124 S. Ct. 1, 4 (2003); *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001). We apply a two-pronged test to ineffective assistance of counsel claims. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999). First, an appellant must show that his counsel's performance was deficient. *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064. The record must be sufficiently developed to overcome a strong presumption that counsel provided reasonable assistance. *Bone v. State*, 77 S.W.3d 828, 833 n.13 (Tex. Crim. App. 2002) (citing *Thompson*, 9 S.W.3d at 813–14). Second, an appellant must show that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064. Further, a claim for ineffective assistance of counsel must be firmly grounded and affirmatively supported by the record. *Thompson*, 9 S.W.3d at 814; *Jackson v. State*, 973 S.W.2d 954, 955 (Tex. Crim. App. 1998). When the record is silent as to possible trial strategies undertaken by defense counsel, we will not speculate on the reasons for those strategies. *See Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994).

16

Here, we are presented with a case demonstrating the "inadequacies inherent in evaluating ineffective assistance claims on direct appeal." *Patterson v. State*, 46 S.W.3d 294, 306 (Tex. App.—Fort Worth 2001, pet. ref'd). Although Kenney filed a motion for new trial, the motion was overruled by operation of law; thus, no hearing was held, and we have no record addressing the reasons for his counsel's actions. Moreover, Kenney's complaints on appeal regarding his counsel concern actions that may or may not be grounded in sound trial strategy, but the record is silent as to his counsel's reasons for doing or failing to do the things of which Kenney complains. *See id.* As such, these issues are better raised via an application for a writ of habeas corpus. Tex. Code Crim. Proc. Ann. art. 11.07; *Rylander v. State*, 101 S.W.3d 107, 110 (Tex. Crim. App. 2003) ("[T]he record on direct appeal will generally 'not be sufficient to show that counsel's representation was so deficient as to meet the first part of the *Strickland* standard' as '[t]he reasonableness of counsel's choices often involves facts that do not appear in the appellate record.'"). Therefore, we overrule Kenney's second point.

## C. No Hearing on Motion for New Trial

In his third point, Kenney argues that the trial court erred by not conducting a hearing on his motion for new trial.[4] The State counters that Kenney "failed to

---

[4]There are two motions for new trial in the clerk's record. The first motion appears to have been handwritten by Kenney. The second is typed and signed by his appellate counsel. We focus on counsel's motion. A defendant has no absolute right to hybrid representation, so courts may ignore pro se motions filed by defendants

17

preserve his claim that the trial court erred in failing to conduct a hearing on his motion for new trial because he did not timely present his motion to the court." We agree with the State.

A defendant must do more than merely file a motion for new trial to preserve the arguments made in it. *Richardson v. State*, 328 S.W.3d 61, 72 (Tex. App.—Fort Worth 2010, pet. ref'd) (per curiam). The defendant must also present the motion for new trial to the trial court within ten days of filing the motion. Tex. R. App. P. 21.6. "The purpose of the presentment rule is 'to put the trial court on actual notice that a defendant desires the trial court to take some action on the motion for new trial such as a ruling or a hearing on it.'" *Stokes v. State*, 277 S.W.3d 20, 21 (Tex. Crim. App. 2009) (quoting *Carranza v. State*, 960 S.W.2d 76, 78 (Tex. Crim. App. 1998)). The Texas Court of Criminal Appeals "consistently has held the filing of a motion for new trial alone is not sufficient to show 'presentment'" and does not preserve an issue for appellate review absent a showing that the trial court has seen the motion. *Carranza*, 960 S.W.2d at 78; *see Navarro v. State*, 588 S.W.3d 689, 691 (Tex. App.—Texarkana 2019, no pet.). Examples of presentment include obtaining the trial court's ruling on the motion, the trial judge's signature or notation on a proposed order, or a hearing date on the docket sheet. *Carranza*, 960 S.W.2d at 79; *Burrus v. State*, 266 S.W.3d 107,

---

with appointed counsel. *Pickett v. State*, No. 02-19-00090-CR, 2020 WL 2073733, at *1 n.3 (Tex. App.—Fort Worth Apr. 30, 2020, pet. ref'd) (per curiam) (mem. op., not designated for publication).

115 (Tex. App.—Fort Worth 2008, no pet.). The defendant bears the burden of presentment. *Burrus*, 266 S.W.3d at 115.

Here, while Kenney filed a motion for new trial raising complaints about the jury charge, jury deliberations, and counsel, there is no ruling on the motion, no order containing the trial judge's signature, no entry on the docket sheet reflecting a hearing on the motion, or anything else in the record to indicate that Kenney presented his motion to the trial court. Because Kenney did not present his motion to the trial court, his complaint that the trial court failed to hold a hearing on his motion is not preserved for our review. *See Carranza*, 960 S.W.2d at 79; *Navarro*, 588 S.W.3d at 691; *Taylor v. State*, No. 02-11-00261-CR, 2012 WL 6196623, at *2 (Tex. App.—Fort Worth Dec. 13, 2012, no pet.) (mem. op., not designated for publication). Accordingly, we overrule Kenney's third point.

## IV. CONCLUSION

Having overruled all three of Kenney's points on appeal, we affirm the trial court's judgment.

/s/ Dana Womack

Dana Womack
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: March 4, 2021

19