ACCEPTED
07-14-00401-CR
SEVENTH COURT OF APPEALS
AMARILLO, TEXAS
7/31/2015 3:52:46 PM
Vivian Long, Clerk

NO. 07-14-00401-CR

STATE REQUESTS
ORAL ARGUMENT
ONLY IF APPELLANT
REQUESTS ARGUMENT

7th COURT OF APPEALS
AMARILLO, TEXAS
7/31/2015 3:52:46 PM
VIVIAN LONG
CLERK

IN THE

COURT OF APPEALS

FOR THE

SEVENTH JUDICIAL DISTRICT OF TEXAS

AMARILLO, TEXAS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

VICTOR MANUEL PENSADO,
Appellant,

VS.

THE STATE OF TEXAS,
Appellee.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ON APPEAL FROM THE 181ST DISTRICT COURT
CAUSE NO. 67,365-B
POTTER COUNTY, TEXAS
HONORABLE JOHN B. BOARD, PRESIDING

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

STATE'S BRIEF

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

RANDALL SIMS, DISTRICT ATTORNEY
KATHERINE L. LEVY, SBN 12266480
Assistant District Attorney
501 S. Fillmore, Suite 5A
Amarillo, Texas  79101
(806) 379-2325; (806) 379-2823 fax
kathylevy@co.potter.tx.us

ATTORNEYS     FOR     THE     STATE

# TABLE OF CONTENTS

PAGE

TABLE OF CONTENTS…………………………………………………..…i

LIST OF AUTHORITIES…………………………………….…………....ii

THE CASE IN BRIEF……………………………………………….....…1

STATEMENT OF THE CASE…………………………………….………2

ISSUE PRESENTED……...………………….…………….…………...2

**RESPONSIVE POINT ONE (TO APPELLANT'S "ISSUE ONE"):**

Appellant received effective assistance of counsel.

STATEMENT OF FACTS……………………………………...…2-13

SUMMARY OF THE ARGUMENT………………………………….13-14

ARGUMENT…………………………………………………14-32

CONCLUSION………………………………………………..32-33

PRAYER…………………………………………….…34

CERTIFICATE OF SERVICE………………………………………34

CERTIFICATE OF COMPLIANCE…………………………………...35

# LIST OF AUTHORITIES

PAGE

CASE LAW

**Bearnth v. State**, 361S.W.3d 135, 145 (Tex.App.—Houston [1ˢᵗ Dist.] 2011, pet. ref'd)……………………………………………………………..…………19

**Bone v. State**, 77 S.W.3d 828, 833, 836 (Tex.Crim.App. 2002)………....27, 31-32

**Carranza v. State**, 960 S.W.2d 76, 79 (Tex.Crim.App. 1998)…………………..19

**Ex parte Menchaca**, 854 S.W.2d 128, 131 (Tex.Crim.App. 1993)……………...16

**Ex parte Woods**, 176 S.W.3d 224, 228 (Tex.Crim.App. 2005)…………………31

**Garcia v. State**, 57 S.W.3d 436, 440 (Tex.Crim.App. 2001)……………………17

**Gardner v. State**, 306 S.W.3d 274, 305 (Tex.Crim.App. 2009)…………………18

**Goodspeed v. State**, 187 S.W.3d 390, 392 (Tex.Crim.App. 2005)…17-18, 27, 33

**Gonzalez v. State**, 376 S.W.3d 141, 142-43 (Tex.App.—Tyler 2012, pet. ref'd)…………………………………………………………………...23-24

**Hernandez v. State**, 726 S.W.2d 53, 57 (Tex.Crim.App. 1986)…………………15

**Hernandez v. State**, 988 S.W.2d 770, 772 (Tex.Crim.App. 1999)………………16

**Hendrickson v. Swyers**, 9 S.W.3d 298, 300 (Tex.App.—San Antonio 1999, no pet.)……………………………………………………………….…..23

**Jackson v. State**, 973 S.W.2d 954, 957 (Tex.Crim.App. 1998)…………………28

**Matthews v. State**, 830 S.W.2d 342, 346 (Tex.App.—Houston [14ᵗʰ Dist.] 1992, no pet.)……………………………………………………………….23

**Mejia v. State**, 681 S.W.2d 88, 90 (Tex.App.—Houston [14ᵗʰ Dist.] 1984, pet. ref'd)……………………………………………………………………23

**Menefield v. State**, 363 S.W.3d 591, 593 (Tex.Crim.App. 2012)………………17

**Mitchell v. State**, 68 S.W.3d 640, 642 (Tex.Crim.App. 2002)…………………..17

**Robinson v. State**, 16 S.W.3d 808, 809-13 (Tex.Crim.App. 2000)……………..20

**Rodriguez v. State**, 292 S.W.3d 187, 190 (Tex.App.—Amarillo 2009, no pet.)..31

**Rozell v. State**, 176 S.W.3d 228, 230 (Tex.Crim.App. 2005)……………………19

**Rylander v. State**, 101 S.W.3d 107, 111 (Tex.Crim.App. 2003)………………...32

**Salinas v. State**, 163 S.W.3d 734, 740 (Tex.Crim.App. 2005)…………………..17

**State v. Moore**, 225 S.W.3d 556, 570 (Tex.Crim.App. 2007)…………………..19

**State v. Zalman**, 400 S.W.3d 590, 594 (Tex.Crim.App. 2013)…………….…..18

**Stokes v. State**, 277 S.W.3d 20, 21 (Tex.Crim.App. 2009)………………….....19

**Strickland v. Washington**, 466 U.S. 668, 687-90, 694, 104 S.Ct. 2052, 2064-66, 2068, 80 L.Ed.2d 674 (1984)………………………………………………...15-17, 27

**Thompson v. State**, 9 S.W.3d 808, 813-14 (Tex.Crim.App. 1999).….17, 26-27, 33

**Weisinger v. State**, 775 S.W.2d 424, 427 (Tex.App.—Houston [14[th] Dist.] 1989, pet. ref'd)……………………………………………………………………….27

STATUTORY LAW AND RULES
**TEX. PENAL CODE, Section 12.35**…………………………………………32

**TEX. PENAL CODE, Section 42.105**………………………………………..23

**TEX. R. APP. P. 9.4**…………………………………………………………..35

**TEX. R. APP. P. 21.4**.............................................................................19-20

**TEX. R. APP. P. 21.6**……………………………………………….………18

**TEX. R. APP. P. 21.8**………………………………………………….……...19-20

NO. 07-14-00401-CR

IN THE

COURT OF APPEALS

FOR THE

SEVENTH JUDICIAL DISTRICT OF TEXAS

AMARILLO, TEXAS
*************************************************************************
VICTOR MANUEL PENSADO,
Appellant,
VS.
THE STATE OF TEXAS,
Appellee.
*************************************************************************
TO THE HONORABLE COURT OF APPEALS:

COMES NOW Appellee, the State of Texas ("State"), and submits its Brief in response to the Brief of Appellant, Victor Manuel Pensado ("appellant"), in the above entitled and numbered appeal. Appellant was convicted of cockfighting in the 181st Judicial District Court of Potter County, Texas, the Honorable John B. Board, Presiding.

THE CASE IN BRIEF

CHARGE                COCKFIGHTING

PLEA                  NOT GUILTY

VERDICT (JURY)        GUILTY

PUNISHMENT (JURY) ONE YEAR IN STATE JAIL/$5,000 FINE

1

In the interest of brevity, the State will use the following designations: (1) the Clerk's Record will be listed as "*CR*" followed by page numbers; (2) the Reporter's Records, "*RR*" followed by volume and page numbers.

## STATEMENT OF THE CASE

Appellant appeals his conviction for cockfighting. *CR:48-50* He was charged by indictment with the offense alleged to have occurred on or about June, 9, 2013. *CR:6* Appellant entered a plea of "not guilty" before a jury on November 12, 2014, and was found "guilty" of the offense after evidence was presented. *CR:32; RR2:152-53; RR3:86* At the conclusion of proceedings on November 13, 2014, appellant was assessed punishment at one year in the State Jail Division of TDCJ, with a $5,000 fine. *CR:35, 48-50; RR3:111* A Notice of Appeal and Motion for New Trial were filed on November 17, 2014, but there is no evidence the motion was presented. *CR:14-15, 21-23* An untimely Amended Motion for New Trial was filed on January 26, 2015, without evidence of presentment. *CR:56-65* The trial court timely certified appellant's right of appeal. *CR:51-52*

## ISSUE PRESENTED

**RESPONSIVE POINT ONE (TO APPELLANT'S "ISSUE ONE"):**

Appellant received effective assistance of counsel.

## STATEMENT OF FACTS

To set a context for the State's response, it offers a narrative of proceedings.

***I. Pre-trial Proceedings.*** Appellant was indicted as follows:

> THE GRAND JURORS for Potter County, Texas, duly organized and sworn as such at the July Term A.D., 2013, of the District Court of the 251st Judicial District, in and for Potter County, Texas, upon their oaths in that Court at that term, present that VICTOR MANUEL PENSADO, hereinafter styled Defendant, on or about the 9th day of June, 2013, and before the presentment of this indictment, in Potter County, Texas, did then and there, knowingly cause a cock to fight with another cock. *CR:6*

Appellant's case was transferred from the 251st to the 181st District Court. *CR:7*

On April 17, 2014, defense counsel was appointed based upon appellant's request although appellant was out on bond and listed $3,500 per month income. *CR:8-10*

Thereafter, multiple pleadings were filed on behalf of appellant, including: a Motion in Limine and Order; Defendant's Election as to Punishment (Jury); and, Application for Community Supervision from the Jury. *CR:37-47*

***II. Guilt-innocence Proceedings.*** On November 12, 2014, appellant's case was called and both sides announced ready and an interpreter was sworn in. *RR2:9* The trial court took judicial notice of appellant's election for jury punishment and of his application for community supervision. *Id.* The defense motion in limine was also noted with no objection from the State. *Id.*

***Initial Trial Activity.*** Both parties participated in *voir dire* examination and 12 prospective jurors were struck for cause. *RR2:25-137* After the jury was sworn in, the indictment was read and appellant's plea was entered. *RR2:138-39, 152-53*

The State gave an opening statement and the defense reserved opening and invoked the Rule. *RR2:153-60* Thereafter, five witnesses testified.

***Ethan Hicks.*** At trial, Hicks was 23 years old and had been an animal control officer over three years. *RR2:161-62* On the afternoon of June 9, 2013, Hicks was dispatched to a house on a possible cockfight taking place. *RR2:163, 166-67*This was the first cockfighting case Hicks had ever investigated. *RR2:167*

The address was a large property with multiple vehicles and separate buildings, including chicken coops. *RR2:164* Hicks approached on foot in the alley and saw the backyard gate was open. *Id.* As he looked in the backyard, everyone turned to him and then appellant walked over. *RR2:164-65* Hicks advised appellant about the call and asked to come in the yard to look around and appellant gave permission and was cooperative. *RR2:164-66, 168, 201-02* Hicks testified there were about 10-20 people scattered about and he reported at least 6-8 were sitting down. *RR2:165, 205-08*

Hicks asked appellant if he had been cockfighting and appellant's first response was, no, that they were getting ready to eat them. *RR2:168, 202* Appellant said the dead birds underneath a table were ones they were getting ready to eat. *RR2:202* When Hicks asked why they were under the table in the dirt, appellant said nothing. *RR2:203* Hicks next asked appellant why he had all these roosters and appellant said he just happened to have them. *Id.* As Hicks looked

4

around the premises more, he saw feathers and blood, in addition to the dead birds, and told appellant he did not believe what appellant had said and then appellant admitted to fighting them. *RR2:168-69, 176-78, 186-87, 202-04; State's Exhibits:15, 20, 89-94* Appellant told Hicks the birds had fought that day and that he trains the roosters and takes them to Mexico. *RR2:168-70, 204*

When Hicks looked in the shed where appellant kept most of the roosters, he saw multiple pens and a small refrigerator with vitamins, antibiotics, de-wormer, and various syringes. *RR2:169, 203* In total, 17 live birds were taken from the property. *RR2:169, 188-91; State's Exhibits:17-18, 21-22, 24-28, 56-61* The two dead roosters were in the coop with the syringes. *RR2:169* Hicks testified the roosters did not appear to have been dead long. *RR2:170* A BB gun and knife were also in the coop and another BB gun on the back porch. *RR2:170, 184-85, 192* Appellant's only explanation about all the roosters was that he was training them to take to Mexico. *RR2:170* Next, appellant left to go to the bathroom and thereafter disappeared from the scene. *RR2:170-71*

Another animal control officer, Carmen Jackson, showed up and took pictures. *RR2:171-72, 194-95* She had more experience than Hicks. *RR2:171* Hicks reviewed and described the pictures from the scene. *RR2:172-93* Gaffs were discussed and shaved spurs and talons. *RR2:178-79, 184-86; State's Exhibits:74-77, 79-80* The small wire pens with feathers and blood were highlighted.

*RR2:174-76, 179, 182, 184, 186; State's Exhibits:2-3, 6-14, 29-31, 62, 64, 70* The mini frig and contents inside the chicken coop got reviewed. *RR2:180; State's Exhibits:33, 36, 38-40, 46* ATVs and the vehicles on the property were discussed and appellant's initials pointed out. *RR2:191-93; State's Exhibits:48, 52-53*

Hicks speaks English, not Spanish, but testified he had no difficulty talking with appellant and appellant spoke English back. *RR2:193-94* Hicks did not feel the need to get an interpreter and appellant never asked for one. *RR2:194* Appellant had a Hispanic accent but spoke in sentences and Hicks understood what he said. *RR2:204* In the 20 minutes before appellant left, Hicks had no trouble communicating with him. *RR2:194* The other people there all left within 10 minutes. *RR2:204-05* Officer Jackson arrived about 10 minutes after appellant disappeared. *RR2:194* It took the police an hour to arrive and Officer Wingate took pictures and collected evidence once there. *RR3:195* The 17 birds from the property eventually had to be euthanized. *Id.*

***Carmen Jackson.*** Jackson has been an animal control officer over six years and has expert level training in animal cruelty and is familiar with cockfighting. *RR3:7-8* She owns barnyard chickens herself for eggs. *RR3:8* In cockfighting, roosters are altered by cutting off the comb and spurs and trimming their wattles. *RR3:9-10* The comb and wattle adjustments are done so the roosters are not as vulnerable for others to grab and yank them down. *RR3:10* The spurs are cut off

6

so gaffs – razor-sharp blades – can be fitted on their legs. *Id.* The roosters are then put in an inescapable cage and fight to the death or until they are too injured to fight anymore. *RR3:10-11* It is a violent practice and the roosters use the gaffs to gouge eyes out, puncture lungs, and break bones. *RR3:11*

On June 9, 2013, Jackson was called as backup to Officer Hicks. *Id.* When she arrived on the property, Hicks was the only person there. *RR3:11-12* Jackson walked in the backyard with Hicks and saw feathers everywhere around two cockfighting pens. *RR3:12* There were blood trails, and, when Jackson walked into the larger chicken coop, she saw two dead roosters under a table in the dirt. *RR3:12, 14* She saw pens with multiple roosters and only one hen. *RR3:12* There was a refrigerator with vitamins, antibiotics, and de-wormer. *RR3:12-13* The frig contents are part of the regimen for fighting roosters and used for conditioning and to build bigger muscles and more stamina. *RR3:13* These items are injected through syringes and there were a couple of syringes laying around. *Id.* They examined the two dead roosters which had gashes from the gaffs all over their bodies. *RR3:13-14* The roosters had not been dead long. *RR3:14*

Jackson took photos and reviewed a few. *RR3:14-16* They found a box of six razor-sharp gaffs. *RR3:16; State's Exhibit:1, 237* There was one egg under one hen with writing on the egg telling what kind of rooster it came from. *RR3:16-21; State's Exhibit:236* The best cockfighting roosters are bred like horses. *RR3:16-19*

There was no indication on this property anybody was raising chickens for eggs to eat. *RR3:20* Jackson was at this Potter County property for an hour and a half and appellant never returned to the scene. *RR3:17* The police arrived and also took pictures. *Id.* There were 17 birds impounded and animal control notified the property owner to come claim them but he never did and they had to be euthanized. *RR3:21-23*

*Matthew Wingate.* Wingate testified he had been an Amarillo police officer for over three years when dispatched to appellant's property. *RR3:24* He arrived about 6:30 p.m. and met Officers Jackson and Hicks. *RR3:25* The animal control officers advised they had been dispatched on an animal cruelty call for cockfighting. *Id.* The owner of the property disappeared before Wingate got there but left two vehicles, his pickup truck and a Volkswagen car. *RR3:25-26; State's Exhibits:52-53, 83* Wingate ran the licenses and they came back registered to appellant. *RR3:26-27* Wingate spoke to a neighbor across the street about who resided in the house and the conclusion was no one other than appellant lived there. *RR3:27* Wingate was on the scene for several hours but appellant never returned. *Id.* Wingate collected the box of gaffs. *RR3:28-29; State's Exhibit:1* He viewed the two dead roosters under the table and seized items in the frig. *RR3:30-31* Lastly, Wingate turned the case over to a detective. *RR3:31*

***Cory Jones.*** Jones has been an Amarillo police officer over 16 years. *RR3:33* This was the first cockfighting case he ever investigated. *RR3:34* During the investigation, he attempted to contact appellant and finally got him by telephone on June 18, 2013. *Id.* Jones explained to appellant he had been assigned the case and was investigating what happened. *RR3:35* Appellant briefly explained over the phone he went to his house and people were in his backyard and he did not know what was going on. *RR3:36* Jones asked appellant why he left before the police got there and appellant said he got scared because he had been drinking. *Id.* Jones asked appellant to come give a statement on the case and appellant agreed to meet on June 19, 2013, at 4:00 p.m., but never showed up for his appointment. *RR3:35-36*

***Defense Opening Statement.*** After the State rested, the judge admonished appellant about the right not to testify and then the defense gave an opening statement. *RR3:40-42* Defense counsel urged appellant would not dispute the fact that a cockfight occurred but that appellant's presence at the time was just a bad coincidence. *RR3:40-41* According to the defense, appellant was not aware cockfights were occurring on his property. *RR3:41* Defense counsel further asserted appellant did not confess to Hicks about doing the cockfights. *Id.* Finally, the defense argued appellant admits he left the scene but only because he was not happy about the cockfighting. *RR3:41-43*

9

***Appellant.*** Appellant is the property owner but testified he had not lived there since his wife and three kids moved out and instead stayed with his mother when in Amarillo. *RR3:43-44, 48-50* Appellant and his wife were married over 15 years and had three kids – ages 16, 14, and 12. *RR3:48, 51* He testified he went by the house every weekend and let a friend named "Mario Barrarra" take care of the property. *RR3:44, 50-51* At trial, appellant had no knowledge of Mario's whereabouts but had known him since Mexico when they were neighbors. *Id.*

Appellant testified he never saw a cockfight before on his property. *RR3:44-45, 56* He claimed to have had a discussion with his friend about keeping roosters but they never talked about fighting them. *RR3:45, 56* Appellant claimed he had chickens but his friend liked roosters and appellant testified he did not want any problems. *RR3:56* On June 9, 2013, appellant claims he stopped by his house and noticed people there at the same time animal control arrived. *RR3:45, 56-57* There were lots of cars and people at his house which appellant thought was weird. *RR3:45, 57* Appellant admits he approached Hicks and let him come in. *RR3:45-46* Appellant denied he ever told Hicks he was fighting cocks. *RR3:46*

Appellant testified that the conversation with Hicks was in English which appellant does not understand very well but he understood what Hicks was saying. *RR3:46, 57* Appellant claims Hicks just did not understand him. *RR3:59* Appellant testified he did not see the dead roosters until Hicks started looking around.

10

*RR3:46* Appellant denies telling Hicks he trained roosters to fight in Mexico. *RR3:46-47, 58-59* Appellant claims he was trying to tell Hicks that in Mexico there are rooster fights. *RR3:58-59* He admits he thinks he told Hicks he was keeping chickens for food. *RR3:47, 57* He acknowledged he told Hicks he killed the roosters to eat them but admits he lied about that because he did not know what else to say. *RR3:57-58* Appellant denies he later admitted to Hicks he was fighting the roosters and had just finished a fight. *RR3:58* Appellant left the scene after speaking with Hicks because he thought he was in a lot of trouble over the dead roosters. *RR3:47, 60* Appellant claims he never met with police because of work and he did not have the time. *RR3:48*

Appellant identified a photo of his house with his pickup and a red car. *RR3:52; State's Exhibits:52, 83, 102* Appellant claimed he always left his truck there and drove the car to the house that day. *RR3:52-53* His friend would sometimes use the truck. *Id.* Appellant testified he owned all the ATVs in the backyard. *RR3:53; State's Exhibit:48* He used the big one and the others were for his kids. *Id.* Consequently, all the vehicles on the property belonged to appellant.

Appellant recognized a pen in his backyard and testified it had been there a long time. *RR3:53; State's Exhibit:5* According to appellant, they used the four visible pens to put the roosters out in the sun. *RR3:53-54* He claims he did not know about the vitamins and antibiotics in the refrigerator, just that the refrigerator

11

was there.  *RR3:54-55* Appellant admits he made the chicken coop but it was for a horse he used to have.  *RR3:55* Appellant remembers speaking with Sgt. Jones on the phone and that he was going to meet him. *RR3:59* Appellant did not go because he had a lot of work and his boss would not let him. *Id.* Appellant admits he never told Sgt. Jones about somebody named "Mario Barrarra" and waited a year and a half till in court to mention him.  *RR3:60, 62*

***Argument and Verdict.***  The State focused on the credibility of Hicks' version of events versus that of appellant. *RR3:71-78* The State highlighted neither Hicks nor Jones had trouble speaking with appellant and appellant's descriptive answers were reviewed. *Id.* Defense counsel also commented:  "I think the real issue for you to decide is this conversation between my client and Mr. Hicks, the animal control officer." *RR3:79*The defense stressed the jury had to figure out whose story was most credible. *Id.* Defense counsel argued appellant was telling the truth and even confessed at trial that it was not true the roosters were killed to eat.  *RR3:81-82* On final close, the Stated agreed "that the main issue was the conversation appellant had with Ethan Hicks."  *RR3:83* After deliberation, the jury found appellant "guilty" of cockfighting.  *RR3:86*

***III. Punishment Proceedings.***  Opening statements were waived and the State retendered evidence and rested.  *RR3:87* Next, appellant testified.

***Appellant.*** Appellant's application for probation was reviewed and that he had never been convicted of a felony or misdemeanor theft. *RR3:88, 93* If given probation, appellant would not use drugs or alcohol and would follow the law. *RR3:90-91* Appellant stated he does construction and farm work for a living, sunrise to sunset, and makes $18 per hour. *RR3:88-89, 92* Appellant testified he is a legal citizen and has lived in this country since he was 18 years old and appellant was aged 41 at trial. *RR3:89, 93* Appellant's kids were mentioned and that he supports them and helps his mother. *RR3:89-91* He visits his kids every weekend and they ride horses, go out to eat, watch movies. *RR3:89* On cross-examination, appellant acknowledged he stays the whole week in Shamrock, Texas, and only drives back to Amarillo on weekends. *RR3:91-92* Appellant's house was up for sale and half of the money would go to his former wife. *RR3:92*

***Argument and Verdict.*** The State argued appellant lied about his involvement and the defense focused on appellant as a hardworking guy with kids and a mother to help and recommended probation over prison. *RR3:102-08* The jury's verdict was one year in a state jail facility with a $5,000 fine. *CR:111*

## SUMMARY OF THE ARGUMENT

Appellant received effective assistance of counsel at both stages of trial. Appellant claims his counsel was ineffective because extra witnesses were not called but appellant has not met his burden of showing both deficiency and

prejudice. The State did not contest that appellant was a good father and employee and did not assert that appellant lived exclusively at his Amarillo property. The main issue at trial was whether the jury believed Hicks or appellant regarding their 20-minute conversation at the scene, and, in particular, appellant's confessions to Hicks regarding the roosters and cockfighting. The presumption of reasonable trial strategy applies here since the record was not sufficiently developed to be discussed on appeal. In sum, appellant has not shown a reasonable probability that the result of the trial would have been different but for trial counsel's alleged deficient performance at guilt-innocence and punishment. Therefore, appellant's claim should be overruled in all respects.

## ARGUMENT

**RESPONSIVE POINT (TO APPELLANT'S "ISSUE ONE") (RESTATED):**

Appellant received effective assistance of counsel.

*I. Appellant's Contentions.* Appellant contends his conviction should be set aside and a new trial ordered because his mother and sister were not called to testify he lived with them on weekends and was a good father and his employer was not called to also discuss what a good worker he was. In appellant's view, it was unacceptable strategy not to present this testimony. According to appellant, no mitigation evidence was presented or a single mitigating factor brought out. *Appellant's Brief ("AB"):17-18, 25-27* If other witnesses had been called,

14

appellant asserts he may not have been found guilty or may have gotten a lesser sentence or probation.

**II. *Summary of the State's Response.*** Appellant testified on his own behalf at both the guilt-innocence and punishment phase of trial and presented ample mitigating evidence. Other witnesses were not called, but there could have been strategic reasons not to put them on the stand. It is unclear from the record whether other witnesses may have benefitted appellant under cross examination. For strategic reasons, defense counsel may have refrained from calling witnesses which may not have supported appellant's claim of ignorance about the roosters and English. Thus, any benefit to be gained from these witnesses may have been offset and contrary to appellant's testimony. Based upon a review of the record, appellant has not shown a reasonable probability of a different result even if more witnesses had been called. In sum, appellant has not met his burden of showing both deficiency and prejudice and a presumption of reasonable trial strategy on this silent record pertains to this claim.

**III. *Argument and Authorities.*** A. <u>Standard of Review</u>. The proper standard for judging a claim of ineffective assistance of counsel was enunciated in **Strickland v. Washington**, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). The **Strickland** standard was adopted by the Texas Court of Criminal Appeals in **Hernandez v. State**, 726 S.W.2d 53, 57 (Tex.Crim.App. 1986). To

prove ineffective assistance, an appellant must show that (1) trial counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) there is a reasonable probability that the result of the proceedings would have been different but for trial counsel's deficient performance. **Strickland**, 466 U.S. at 694, 104 S.Ct. at 2068; **Ex parte Menchaca**, 854 S.W.2d 128, 131 (Tex.Crim.App. 1993). Both prongs of the test must be shown for there to be ineffective assistance of counsel; unless both showings are made, "it cannot be said that the conviction … resulted from a breakdown in the adversary process that renders the result unreliable." **Strickland**, 466 U.S. at 687, 104 S.Ct. at 2064; **Menchaca**, 854 S.W.2d at 131. The **Strickland** standard also applies to the punishment phase of a noncapital proceeding. **Hernandez v. State**, 988 S.W.2d 770, 772 (Tex.Crim.App. 1999).

Under **Strickland**, it must be determined whether counsel's assistance was reasonable considering all the circumstances, whether under the circumstances, the challenged action might be considered sound trial strategy, and whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. **Strickland**, 466 U.S. at 688-90, 104 S.Ct. at 2065-66. In evaluating counsel's performance, judicial scrutiny of the performance must be highly deferential, with every effort made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's

challenged conduct, and to evaluate the conduct from counsel's perspective at the time. **Id.** at 689, 104 S.Ct. at 2065.

There is a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. **Thompson v. State**, 9 S.W.3d 808, 813 (Tex.Crim.App. 1999); **Salinas v. State**, 163 S.W.3d 734, 740 (Tex.Crim.App. 2005). To defeat the presumption of reasonable professional assistance, any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. **Thompson**, 9 S.W.3d at 814; **Goodspeed v. State**, 187 S.W.3d 390, 392 (Tex.Crim.App. 2005). Absent an opportunity for trial counsel to explain his actions, the appellate court should not find deficient performance unless the challenged conduct was so outrageous that no competent attorney would have engaged in it. **Menefield v. State**, 363 S.W.3d 591, 593 (Tex.Crim.App. 2012); **Goodspeed**, 187 S.W.3d at 392. In the absence of evidence of counsel's reasons for the challenged conduct, an appellate court commonly will assume a strategic motivation if any can possibly be imagined. **Garcia v. State**, 57 S.W.3d 436, 440 (Tex.Crim.App. 2001).

Generally, the record on direct appeal will not be sufficient to show that counsel's representation was so deficient as to meet the first part of the **Strickland** standard. **Mitchell v. State**, 68 S.W.3d 640, 642 (Tex.Crim.App. 2002). As pertains to the instant matter, direct appeal is an inadequate vehicle for raising an

17

ineffective assistance of counsel claim because the record is generally undeveloped. **Goodspeed**, 187 S.W.3d at 392.

B. <u>Motion for New Trial and Presentment</u>. The jury rendered a punishment verdict against appellant and sentenced was imposed on November 13, 2014. *CR:48* Less than one week later, appellant timely filed his motion for new trial. *CR:21-23* In the motion, appellant asserted "[t]he verdict is contrary to the law and evidence" and urged the judge "set aside the judgment of conviction entered in this cause and order a new trial on the merits." *CR:21* The Court of Criminal Appeals has explained that a claim that a verdict "was against the law and the evidence" raises a sufficiency challenge to the evidence but does not present any other claim. *See* **State v. Zalman**, 400 S.W.3d 590, 594 (Tex.Crim.App. 2013).

No affidavits were attached to appellant's motion, and the motion did not further explain how the verdict was inconsistent with the law or the evidence. *CR:21-23* Although appellant timely filed his motion for new trial, the record does not contain any ruling on the motion, a proposed order containing the trial judge's signature or notation, or a docket entry evidencing a hearing on the motion. *See* **TEX. R. APP. P. 21.6** (requiring defendant to present the motion for new trial to the trial court within 10 days of filing); **Gardner v. State**, 306 S.W.3d 274, 305 (Tex.Crim.App. 2009).

18

"In addition to timely filing the motion with supporting affidavits that demonstrate reasonable grounds for believing that some error has occurred, the defendant must present the motion to the trial court." **Rozell v. State**, 176 S.W.3d 228, 230 (Tex.Crim.App. 2005). Presentment requires a defendant to do more than simply file the motion for new trial. **Bearnth v. State**, 361 S.W.3d 135, 145 (Tex.App.—Houston [1st Dist.] 2011, pet. ref'd). To present a motion, the defendant must give the trial court actual notice that he timely filed a motion for new trial and requests a hearing on the motion for new trial. *See* **id.**; **Carranza v. State**, 960 S.W.2d 76, 79 (Tex.Crim.App. 1998). Hereunder, appellant did not satisfy the procedural requirements that the motion be actually presented. **Stokes v. State**, 277 S.W.3d 20, 21 (Tex.Crim.App. 2009).

Next, appellant filed an untimely Amended Motion for New Trial on the afternoon of the 74th day after appellant's sentence was imposed. *CR:56-65 See* **TEX. R. APP. P. 21.4** (setting out 30-day deadline for filing amended motion for new trial without leave of court), **21.8** (providing that motion for new trial is "deemed denied" if not ruled upon "within 75 days after imposing or suspending sentence"); **State v. Moore**, 225 S.W.3d 556, 570 (Tex.Crim.App. 2007) (construing **rule 21.4** as allowing defendant to file amended motion for new trial provided that original motion for new trial was timely filed, that amendment was made within 75-day period within which original motion must be ruled upon

before being deemed overruled by operation of law, and that State does not object to untimely amendment). This late amended motion presented an ineffectiveness claim and contained affidavits from appellant's family and employer. *CR:56-65*

Here, in addition to enlarging on his original motion with the added ineffectiveness claim after the 30-day period to amend had expired, no presentment was made or objection. **TEX. R. APP. P. 21.4(a)-(b)**. The record should be sufficient to demonstrate that the State was afforded a meaningful opportunity to object to the untimely amendment, or to any order purporting to grant it, within the 75-day period. **Id.** Ultimately, appellant's amended motion for new trial was overruled by operation of law, or, the day after filing. *See* **TEX. R. APP. P. 21.8**. While the State did not object to the untimeliness of appellant's amended motion for new trial, it remains questionable whether the State was afforded a meaningful opportunity to do so upon late service of the actual amended motion.

Nevertheless, it is well settled that an ineffective assistance of counsel claim may be raised without the necessity of a motion for new trial. *See* **Robinson v. State**, 16 S.W.3d 808, 809-13 (Tex.Crim.App. 2000). Therefore, the State will address the claim based on the trial record and discuss appellant's argument below.

C. <u>Discussion</u>. Appellant claims he was deprived of effective assistance at both stages of trial and he asserts that counsel's performance was deficient and that he was harmed when counsel (1) failed to call witnesses at guilt-innocence to

corroborate his living situation, and (2) failed to call favorable character witnesses to support his plea for probation. While appellant claims no mitigation or favorable evidence was presented, he ignores the ample testimony provided by appellant on his own behalf. The State urges that even though the jury believed the testimony of Hicks over appellant about the roosters and cockfighting, they gave him only a mid-range sentence, or, half the maximum.

1. *Guilt-Innocence*. The defense filed multiple pleadings and these were discussed at the pre-trial hearing when the case was called. *CR:37-47; RR2:9* Notably, appellant's application for probation from the jury had been filed and the trial judge took judicial notice of it. *RR2:9* During the *voir dire* examination, defense counsel actively participated, and indeed, a total of 12 jurors were struck. *RR2:25-137* Five witnesses were called to testify, including appellant, and defense counsel objected a total of 15 times and was notably sustained on more than half of his objections. *RR2:73, 165, 177-78, 182, 207; RR3:10, 12, 21, 28-30, 35-36, 60* Ample mitigation evidence was presented by appellant at both the guilt-innocence and punishment phases of trial. *RR3:43-62, 88-94*

Appellant entered a plea of "not guilty" and claimed ignorance of the cockfighting operation at his house throughout the proceedings. *RR2:152-53* The main issue at trial revolved around the 20-minute conversation on the property between appellant and animal control officer Hicks. *RR2:168-70, 202-04, 194;*

21

*RR3:44-47, 57-58, 71-83*  According to appellant, testimony from his sister and mother about appellant's unique living situation would have supported his claim of total ignorance about the cockfighting and led the jury to have found him "not guilty" of the crime. *AB:18-23* As appellant testified, however, he checked in weekly at his property when in Amarillo. *AB:19; RR3:43-44, 49-51*  In the State's view, whether appellant ate or slept elsewhere when in Amarillo on the weekends is really of no import.  Appellant's purported language barrier, ignorance of the roosters and cockfights, and other matters may have concerned the defense had other witnesses been put on the stand and subjected to cross-examination.

Assuming trial counsel was ineffective for not presenting witnesses to discuss appellant's living situation, appellant fails to demonstrate that he was prejudiced by this alleged ineffectiveness.  The jury did in fact hear evidence through appellant's testimony about his living situation and it is doubtful more testimony would have made for a different outcome.  Appellant testified he checked in on his property weekly and incriminating evidence was present throughout; including, multiple roosters, cockfighting pens, gaffs, blood and feathers, syringes and other cockfighting materials. Appellant did not have to live at the property to maintain and have knowledge of the roosters and the cockfighting operation.  Evidence that he spent weekdays at an out-of-town ranch was already before the jury and that he ate and slept at his mom's on weekends.

Given the potential hazards involved, even if more witnesses were called, the defense decision not to call them could be considered strategic as these witnesses may not have benefitted appellant in the end. Experienced trial counsel must weigh the potential benefit of witness testimony against, among other things, the potential adverse impact of cross-examination. *See* **Matthews v. State**, 830 S.W.2d 342, 346 (Tex.App.—Hosuton [14th Dist.] 1992, no pet.).

Although appellant initially claimed the birds were raised for the production of food, the evidence established the roosters were raised for the purpose of fighting. *RR3:12-14* At the residence, the animal control officers found two dead roosters along with multiple roosters in cages. Only one chicken was identified sitting on a lone marked egg in a pet carrier and the evidence established this was a breeding hen and fighting cock egg. *RR3:12, 16-21* It was evident at trial that these roosters were not raised for food but for the purpose of fighting, an activity that is illegal in Texas. *See* **TEX. PENAL CODE, Section 42.105**; **Mejia v. State**, 681 S.W.2d 88, 90 (Tex.App.—Houston [14th Dist.] 1984, pet. ref'd); **Hendrickson v. Swyers**, 9 S.W.3d 298, 300 (Tex.App.—San Antonio 1999, no pet.).

Appellant's case is very similar to **Gonzalez v. State**, 376 S.W.3d 141 (Tex.App.—Tyler 2012, pet. ref'd). Therein, in response to citizen complaints, officers went to a residence and found a gathering of about 20 people, many of which left as officers approached. **Id.** at 142. At the Gonzalez residence, officers

23

found two dead roosters and blood on the ground near the area of a ring for cockfighting and a table with gaffs to attach to the roosters legs for cockfighting and syringes and other materials for the cockfighting activity. **Id.** at 143. While appellant claimed his cages were just for "sunning" the roosters, Gonzalez claimed his cages were for "sparring" and not fighting the birds. *RR3:53-54;* **Id.**

Highlights from the scene at appellant's property and trial include: dispatch on possible cockfight taking place (*RR2:163, 166-67; RR3:25*); up to 20 people at the location and all scatter once animal control arrives, except appellant (*RR2:164-65, 205-08*); initially, appellant denied there had been cockfighting and said they were getting ready to eat them (*RR2:168, 202*); when asked why he had so many roosters, appellant said he just happened to have them (*RR2:203*); the property had pens with multiple roosters and one hen sitting on one egg with writing on it and no indication on this property that anybody was raising chickens for food or eggs to eat (*RR3:12, 16-21*); appellant said the two dead roosters in the dirt, under a table with syringes and gaffs, were the birds they were getting ready to eat (*RR2:168-70, 178-79, 184-86; RR3:13-14*); vitamins, antibiotics, and de-wormer in the refrigerator were identified as part of the cockfighting regimen for conditioning, bigger muscles, and more stamina and gaffs were discussed as blades to attach to the roosters to gouge eyes, puncture lungs, and break bones (*RR2169, 203; RR3:10-13*); after viewing the premises, feathers and blood trails and the

24

small wire cockfighting pens, appellant finally admitted to Hicks the birds had fought that day and that he trains roosters and takes them to Mexico (*RR2:168-70, 174-82, 184, 186-87, 202-04; RR3:12, 14*); a neighbor told police no one other than appellant lived at the residence (*RR3:27*); ATVs in the backyard and a car and pickup truck on the premises were all owned by appellant (*RR2:191-93; RR3:25-27, 52-53*); appellant said he had to go to the bathroom but fled the scene and never returned while officers were there (*RR2:17-71, 194; RR3:27*); lastly, appellant agreed to come in and give a statement to police but he never showed up for his appointment (*RR3:35-36*).

A year and a half later, for the first time appellant claims someone named "Mario Barrarra" was responsible for the cockfighting operation at the property but appellant professed ignorance of the whereabouts of "Mario" at trial (*RR3:44, 50-51, 60, 62*). Although the owner of the residence, appellant claimed it was just a bad coincidence he was there the day of the cockfight and claimed he left the scene because he had been drinking and was afraid he was in trouble over the dead roosters (*RR:36, 43-44, 47-51, 56, 60*). He did not meet with police later because of work and testified he really did not have the time (*RR3:48, 59*). Appellant admitted on cross he had a discussion with "Mario" because he knew about the keeping of roosters and did not want any problems (*RR3:56*). Appellant denies he ever told Hicks he was fighting cocks or training them to fight in Mexico and that

he had just finished a fight that day and claims Hicks just did not understand him (*RR3:46-47, 58-59*). Appellant admitted he lied to Hicks that he killed the roosters to eat them and kept the birds for food because he did not know what else to say (*RR3:57-58*). Appellant recognized the pens and coops and refrigerator contents at trial but minimized what these items were used for in his backyard; however, appellant testified the four cockfighting pens in the backyard were used for the roosters to get some sun (*RR3:53-55*).

For closing arguments, the focus was on the different version of events told by Hicks and appellant. *RR3:71-83* The State never contested appellant's work schedule and that he lived the majority of the time on a ranch out of town and not at the residence. Appellant's amended motion for new trial complains that defense counsel was ineffective because he should have called appellant's mother and sister to confirm his living situation. *AB:23* The reason for not calling other witnesses goes unexplained in the record, but there could very well have been strategic reasons. The record remains silent regarding trial counsel's strategy. With a silent record, the Court has not been provided "a record capable of providing a fair evaluation of the merits of the claim involving such a serious allegation. In the majority of instances [such as this one], the record on direct appeal is simply undeveloped and cannot adequately reflect the failings of counsel." **Thompson**, 9 S.W.3d at 813-14.

The **Strickland** analysis begins strongly presuming that counsel was competent and that his decisions "fell within the wide range of reasonable professional assistance." **Strickland**, 466 U.S. at 689, 104 S.Ct. at 2065; **Thompson**, 9 S.W.3d at 814. Appellant complains counsel was ineffective because he should have called more witnesses but only rarely will a sufficiently developed record "permit a reviewing court to fairly evaluate the merits of such a serious allegation." **Bone v. State**, 77 S.W.3d 828, 833 (Tex.Crim.App. 2002) ("In the majority of cases, the record on direct appeal is simply undeveloped and cannot adequately reflect the failings of trial counsel."). Absent affirmative evidence of misconduct, ineffective assistance will not be inferred where the record is silent on facts, circumstances, or counsel's rationale unless the challenged conduct was "so outrageous that no competent attorney would have engaged in it." **Goodspeed**, 187 S.W.3d at 392. No such affirmative evidence of outrageous misconduct is present in the record of the instant matter.

The State urges appellant cannot overcome the presumption that his lawyer competently made a strategic, professionally sound decision in light of the record as a whole. "It is the trial counsel's prerogative, as a matter of trial strategy, to decide which witnesses to call." **Weisinger v. State**, 775 S.W.2d 424, 427 (Tex.App.—Houston [14th Dist.] 1989, pet ref'd). Appellant has not provided enough evidence to overcome the presumption that trial counsel's decision to not

call more witnesses was strategic. Appellant does not direct attention to any other evidence in the trial record that would allow one to veer into counsel's decision-making process and provide insight as to his rationale regarding trial strategy. In short, appellant has not offered evidence beyond assertions in his brief sufficient to overcome the presumption of defense counsel's competence.

In the majority of cases, the record on direct appeal is simply undeveloped and cannot adequately reflect the alleged failings of trial counsel; this is particularly true when the alleged deficiencies are matters of omission and not of commission revealed in the record. **Jackson v. State**, 973 S.W.2d 954, 957 (Tex.Crim.App. 1998). Appellant has simply not demonstrated his trial counsel was ineffective – deficient and prejudicial – in handling the guilt-innocence phase.

2. *Punishment.* For the punishment phase, appellant also complains his attorney failed to call other witnesses to testify about the same matters as appellant: his work ethic and love and support of his children. *AB:23-28* Again, however, the State responds that the same undisputed testimony was already eloquently given by appellant. *RR3:88-92* Additional testimony would have been cumulative and possibly not helpful in the end. Therefore, appellant's position that more mitigation evidence about the same issues in appellant's life would have made for a different outcome is an untenable conclusion. Given the potential hazards

28

involved, even if additional witnesses were identified earlier, a trial counsel's decision not to call them could be considered wise strategy.

Although appellant argues no mitigation evidence was offered at trial, appellant himself gave extensive mitigating evidence about his personal history and hard work at a ranch, his active involvement with his children, and assistance to his mother. *RR3:43-44, 48-51, 53, 88-92* The jury heard appellant had a good steady job and made $18 an hour. *RR3:88-89, 92* Besides the large property he owned in Amarillo, the jury saw appellant owned an impressive array of vehicles: a nice pickup truck, red Volkswagen, and a fleet of ATVs in his backyard. *RR3:52-53; State's Exhibits:48, 52, 83, 102* Appellant asked the jury for probation and promised to follow the law and not use drugs or alcohol. *RR3:90-91* He testified he never had been convicted of a felony or misdemeanor theft. *RR3:88, 93* If given probation, appellant stated he would be able to support his children better and help his mother. *RR3:89-91* Trial counsel obviously wanted to minimize appellant's involvement in animal cruelty and made an artful use of appellant's own testimony regarding his care of family and work ethic for the jury to consider probation instead of incarceration. More testimony from other potential witnesses might not have added much to what was already before the jury and additional testimony would have been cumulative of other evidence presented at trial and potentially harmful.

The affidavits attached the late-amended motion are quite detailed and well written and do not support appellant's claim that he had a language barrier that caused Hicks to not understand appellant. In particular, the affidavits of appellant's mother and younger sister do not suggest any language issue for these long-time residents and U.S. citizens. *CR:62-65* Likewise, appellant's employer mentions no communication issues, and, in fact, notes appellant's prowess in learning new skills and ability to review electrician manuals and rewire ranch property. *CR:60* At trial appellant claimed he really did not understand English very well and had such serious communication issues but the affidavits do not support his claim. *AB:Appendix B, Exhibits A-C; CR:61* Moreover, appellant's employer might not have supported appellant's position at trial that his employer would not let him make the scheduled appointment with police. *RR3:59*

Finally, appellant waited over a year and a half to testify in court that a person named "Mario" lived in his house but Mario was never mentioned to Hicks or Jones. *RR3:59-62* When cross examined about the mysterious Mario, appellant testified he knew Mario as a neighbor in Mexico when the family lived there but appellant's mother claimed she never met Mario. *RR3:44, 50-51; CR:64; AB:Appendix B, Exhibit C* On several levels, the affidavits attached to the amended motion do not necessarily provide supporting evidence and, if these witnesses were subjected to cross examination, they may have not benefitted appellant at

punishment. Thus, defense counsel may have made a reasonable strategic decision to forego presentation of additional witnesses to testify on appellant's behalf.

Appellant and his attorney did offer mitigation evidence and attempted to persuade the jury to give appellant probation. At punishment, the focus was on appellant as a good candidate for probation and one capable of hard work with no prior criminal convictions. *RR3:88-93, 106-08* Appellant pleaded his case for leniency and trial counsel further argued for probation on his behalf. *Id.* The mere fact that three other witnesses may have been available to testify does not make the decision to forgo that testimony an unwise one. *See* **Bone**, 77 S.W.3d at 833, 836; **Ex parte Woods**, 176 S.W.3d 224, 228 (Tex.Crim.App. 2005) (defendant did not show that counsel's decision to present only some testimony at sentencing was not an acceptable strategic decision). Without record evidence of counsel's reasons for not offering more testimony, appellant is unable to overcome the presumption that counsel's conduct falls within the wide range of reasonable professional assistance. **Rodriguez v. State**, 292 S.W.3d 187, 190 (Tex.App.—Amarillo 2009, no pet.). Appellant has not shown a reasonable probability exists that the jury would have assessed a lesser sentence or even probation if there was more testimony and counsel's reasons for not offering such evidence.

As stated above, because the reasonableness of trial counsel's choices often involves facts that do not appear in the appellate record, the Court of Criminal

Appeals has stated that trial counsel should ordinarily be given an opportunity to explain his actions before a court reviews the record and concludes that counsel was ineffective. *See* **Rylander v. State**, 101 S.W.3d 107, 111 (Tex.Crim.App. 2003); **Bone**, 77 S.W.3d at 836. Appellant's ineffectiveness claim falls short. The jury assessed only middle range punishment at one year in state jail and a 5,000 fine. *See* **TEX. PENAL CODE, Section 12.35(a)-(b)** (providing that punishment range for state jail felony is imprisonment for not more than two years or less than 180 days and a fine not to exceed $10,000); *CR:33-35, 48* Although appellant did not receive probation, he was assessed half the maximum fine and imprisonment. On this record, appellant has not shown he received ineffective assistance.

## CONCLUSION

In conclusion, there was no evidence of ineffective assistance as trial counsel's strategy was not shown in the record. Because trial counsel's strategy is not shown on the face of the record, deficient performance should not be found unless the challenged conduct was so outrageous that no competent attorney would have engaged in it which is not the case hereunder. Although the evidence failed to convince the jury appellant was innocent or should get probation, appellant received effective assistance. Appellant's late-filed amended motion for new trial and affidavits do not establish appellant's entitlement to relief. Even if extra witnesses were called to discuss appellant's living arrangements and confirm

appellant was a good father and worker, that does not led one to conclude that there is a reasonable probability that, but for counsel's omission, the result of the proceeding would have been different. Further, under cross examination, these additional witnesses may have not benefitted appellant and may have caused him harm. Bottom line, the jury believed the testimony of Hicks over appellant.

When, as in this case, there is no proper evidentiary record developed at a hearing on a motion for new trial, it is extremely difficult to show trial counsel's performance was deficient, especially when the record provides no discernable explanation of the motivation behind counsel's actions – whether those actions were of strategic design. *See* **Thompson**, 9 S.W.3d at 814. Contrary to appellant's claim, this case is not the rare case where ineffectiveness can be found with a silent record. As such, appellant's claim of ineffectiveness should be overruled since trial counsel has not been afforded an opportunity to explain his actions "before being denounced as ineffective." *See* **Goodspeed**, 187 S.W.3d at 392. Appellant has not met his burden of showing deficient performance at either trial phase. Nor has he shown prejudice, and that the result would have been different but for defense counsel's alleged deficient performance.

Appellant's sole issue should be denied in all respects.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, the State respectfully prays that this Honorable Court overrule appellant's issue and affirm the conviction.

Respectfully submitted,
RANDALL SIMS, 47TH DISTRICT ATTORNEY
Potter County Courts Building

/s/ Katherine L. Levy
KATHERINE L. LEVY, SBN 12266480
Assistant District Attorney
501 S. Fillmore, Suite 5A
Amarillo, Texas 79101
kathylevy@co.potter.tx.us
(806) 379-2325; fax (806) 379-2823

ATTORNEYS FOR THE STATE

## CERTIFICATE OF SERVICE

I hereby certify that on this the 31st day of July, 2015, a true copy of the foregoing State's Brief was served on appellant's attorney, Hillary S. Netardus, P. O. Box 50652, Amarillo, Texas, 79159-0652, email address hillarynetardus@yahoo.com.

/s/ Katherine L. Levy
Assistant District Attorney

## CERTIFICATE OF COMPLIANCE

In accordance with **TEX. R. APP. P. 9.4(i)(3)**, I hereby certify that the foregoing Brief contains, as reflected in the computer word count, 8,472 words. That count includes all words in the Brief, including words which, under the Rule, are excluded from the prescribed word limit.

/s/Katherine L. Levy
Assistant District Attorney